## ROXFORD KNITTING CO. v. MOORE & TIERNEY, Inc.

## SAME v. WM. MOORE KNITTING CO.

(Circuit Court of Appeals, Second Circuit.    March 18, 1920.)

Nos. 70, 71.

1. **War ⬅️➡️4—Taking of product of factory by government for war purposes excuses failure to fulfill prior contract.**

A manufacturer of underwear, which had contracted to furnish defendant with a stated quantity of its goods to be delivered at intervals, *held* not chargeable with breach of the contract because of its failure to deliver within the time fixed, caused by the taking of its entire product during a number of months to supply goods for the army and navy on orders given through the Advisory Commission of the Council of National Defense, although such orders were in form voluntary contracts, signed by both parties, where such form was customarily used by purchasing departments when prices were agreed on, and where it was understood by both parties, as shown by the negotiations, that if the contracts were not accepted the goods or the seller's plant would be commandeered under National Defense Act June 3, 1916, § 120 (Comp. St. § 3115g).

2. **War ⬅️➡️4—Compulsory "order" for supplies under National Defense Act may be in form of contract.**

Under National Defense Act June 3, 1916, § 120 (Comp. St. § 3115g), authorizing the President in time of war or when war is imminent, through the head of any department, "to place orders" for such products as may be required, and making orders so given obligatory, and giving them precedence over all other orders and contracts, but not prescribing their form, and the Navy Purchase Act of March 4, 1917, making similar provisions respecting naval supplies, no particular form of orders is essential, and they may take the form of contracts signed by both parties, where the seller is given to understand that he has no option to refuse to furnish the supplies. Nor is it necessary that such orders should be signed by the President or the head of a department, but it is sufficient that they be made through the appropriate executive department in the regular course of business.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Order.]

In Error to the District Court of the United States for the Northern District of New York.

Action by Moore & Tierney, Incorporated, and by the Wm. Moore Knitting Company against the Roxford Knitting Company. Judgment for plaintiff in each case, and defendant brings error. Affirmed.

For opinions below, see 250 Fed. 278, 288. Certiorari denied, 252 U. S. ——, 40 Sup. Ct. 588, 64 L. Ed. ——.

The questions of law involved in the two cases are identical. They were argued together and will be decided in one opinion. The actions were commenced in the New York Supreme Court in the county of Saratoga, and were removed to the United States District Court for the Northern District of New York. The defendant in error, in each case, was plaintiff below, and is hereinafter called plaintiff. The plaintiff in error, in each case, was defendant below, and is hereinafter called defendant. The plaintiff is a corporation organized and existing under the laws of the state of New York, and owns and operates a factory for the manufacture of men's underwear, consisting of knit shirts and drawers. The defendant is a corporation organized and existing under the laws of the state of Pennsylvania.

⬅️➡️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In the first of these actions the plaintiff alleged that defendant is justly indebted to it in the sum of $14,090.08 on account of goods, wares, and merchandise sold and delivered to defendant at its request at agreed prices on various dates and times between the 18th day of May and the 10th day of September, 1917. The defendant in its answer conceded that plaintiff had sold and delivered the merchandise sued for, but by way of counterclaim pleaded that the parties to the litigation had entered into an agreement for the manufacture and delivery of certain underwear; that a part only, to wit, that sued for, had been delivered. and that because of the failure of plaintiff to deliver the balance, defendant had suffered damage in excess of the amount sued for.

The plaintiff in its reply sought to avoid liability to defendant for its admitted failure to make complete delivery by the fact that the United States government had "commandeered" it to make delivery to it of supplies of underwear for the army and navy, which required the entire production of the plaintiff's factory and plant from July 1, 1917, until after October 1, 1918, and that this prevented it from making complete delivery of all the goods which it had agreed to manufacture and deliver to defendant. The issue raised by the reply was separately tried in advance, and a jury trial was waived. It was decided that by reason of the facts proved plaintiff had established its reply, and accordingly the counterclaim was dismissed, and judgment was entered for the plaintiff for the amount demanded in the complaint. Moore & Tierney, Inc., v. Roxford Knitting Co. (D. C.) 250 Fed. 278.

Gallert & Heilborn, of New York City (Walter S. Heilborn and David J. Gallert, both of New York City, of counsel), for plaintiff in error.

Thomas O'Connor, of Waterford, N. Y. (George E. O'Connor, of Waterford, N. Y., of counsel), for defendants in error.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). In December, 1916, the plaintiff agreed to manufacture at its factory in the city of Cohoes, in the state of New York, for the defendant, certain knit underwear. The deliveries were to be made at various times stated in the orders between February 1, 1917, and December 15, 1917. All the orders received from defendant and accepted by plaintiff were taken subject to the following:

"All orders are taken subject to delays or nondelivery caused by strikes, accidents, fire, or for any other reason beyond our control."

It is not questioned that, if a party by his contract charges himself with an obligation possible to be performed, he must make it good, unless performance is rendered impossible by the act of God, the law, or the other party. If what is agreed to be done is possible and lawful, it must be done. Sun Printing & Publishing Ass'n v. Moore, 183 U. S. 642, 22 Sup. Ct. 240, 46 L. Ed. 366; Carnegie Steel Co. v. United States, 240 U. S. 156, 165, 36 Sup. Ct. 342, 60 L. Ed. 576. The plaintiff admits that it entered into contracts with defendant which it did not completely perform within the time agreed upon. The performance was not prevented either by act of God or the other party. Was it prevented by the law? If not, was performance excused under the clause in the contracts declaring that the obligations assumed were subject "to delays or nondelivery caused by * * * any other reason beyond our control"?

[1] The plaintiff seeks to excuse its failure to perform its contracts by the fact that the United States government placed with it certain orders for war materials for the army and navy, which orders the plaintiff alleges it was obliged to accept, and that the said orders of the government required the entire production which was possible to be made from plaintiff's factory and plant from July 1, 1917, until after October 1, 1918. This it claims relieved it from any duty or obligation to defendant by reason of the agreements which had been previously made between plaintiff and defendant. It declares that on July 6, 1917, it notified defendant that plaintiff had been obliged to enter into said contracts with the United States government, and that plaintiff in consequence would be unable to make any of the goods it had agreed to make for defendant, except those that had been made and delivered, and that further deliveries were prevented by reason of its orders and contracts with the government of the United States.

In time of war or of impending public danger, and without statutory authorization, private property may be appropriated to the public use. In Mitchell v. Harmony, 13 How. 115, 133 (14 L. Ed. 75), Chief Justice Taney states that there are without doubt occasions in which a military officer may impress private property into the public service, or take it for public use; the government being bound in all such cases to make full compensation to the owner. He adds:

"But we are clearly of opinion that in all of these cases the danger must be immediate and impending, or the necessity urgent for the public service, such as will not admit of delay, and where the action of the civil authority would be too late in providing the means which the occasion calls for. * * * It is the emergency that gives the right, and the emergency must be shown to exist before the taking can be justified."

That was a case which had its origin in the Mexican War. The subject was again before the court in United States v. Russell, 13 Wall. 623, 20 L. Ed. 474, in a case which had its origin in the War between the States. Mr. Justice Clifford, writing for the court, says that beyond all doubt in cases of extreme necessity, in time of war or of immediate and impending public danger, private property may be appropriated to the public use without the consent of the owner, and in enumerating the property which can be taken he refers among other things to—

"food or medicine for a sick and famishing army, utterly destitute and without other means of such supplies, or [property] to transport troops, munitions of war, or clothing to reinforce or supply an army in a distant field, where the necessity for such reinforcement or supplies is extreme and imperative. * * * Exigencies of the kind do arise in time of war or impending public danger, but it is the emergency, as was said by a great magistrate, that gives the right, and it is clear that the emergency must be shown to exist before the taking can be justified."

Congress, however, as appears hereinafter in this opinion, has legislated upon this subject, and empowered the President in time of war or of national emergency, to be determined by the President by proclamation, to place "orders" for war supplies, and made such "orders" obligatory on any person to whom such orders are given,

and provided that such "orders" shall take precedence over all other orders and contracts theretofore placed with such persons. There are four separate orders which were given to plaintiff by the government:

(1) One dated June 6, 1917, required the plaintiff to deliver to the Quartermaster's Department of the United States Army in the city of New York, on or before December 31, 1917, 36,000 undershirts and 36,000 pairs of drawers in equal monthly deliveries of 12,000 garments, commencing July 1, 1917.

(2) One dated July 25, 1917, requiring the plaintiff to deliver to the Navy Yard in the city of New York, before December 1, 1917, 38,000 undershirts and 38,000 pairs of drawers.

(3) One dated November 16, 1917, requiring the plaintiff to deliver to the Quartermaster's Department of the United States Army, in the city of New York, on or before December 31, 1917, 6,000 undershirts and 6,000 pairs of drawers.

(4) One dated December 12, 1917, requiring the plaintiff to deliver to the Quartermaster's Department of the United States Army, on or before September 30, 1918, 108,000 undershirts and 108,000 pairs of drawers.

These orders were all placed after the enactment of the National Defense Act. 39 Stat. 166. The defendant insists that all four of these orders were contracts voluntarily entered into, and that contracts with the government for military supplies, even in time of war, afford no excuse for the nonperformance of civil contracts. If the orders were contracts voluntarily made, we agree that the performance of contracts so made was not entitled to precedence over other contracts previously taken.

The National Defense Act of June 3, 1916, c. 134, § 120 (Comp. St. § 3115g), empowered the President in time of war, or when war is imminent, through the head of any department of the government, to place orders for such products as might be required, and made orders so given obligatory, and gave them precedence over all other orders and contracts. It made any individual or the responsible head of any association or corporation failing to comply with the provisions of the section guilty of a felony, and provided that upon conviction he should be punished by imprisonment for not more than three years and by a fine not exceeding $50,000. See U. S. Stat. at Large, vol. 39, pt. 1, c. 134, § 120, p. 213. The constitutionality of this act is not challenged. That its enactment was a lawful exercise of the war powers of Congress must be conceded.

By an act of Congress passed on August 29, 1916 (39 Stat. 619), a Council of National Defense was established, for the co-ordination of industries and resources for the national security and welfare. It consisted of the Secretary of War, the Secretary of the Navy, the Secretary of the Interior, the Secretary of Agriculture, the Secretary of Commerce, and the Secretary of Labor. The Council of National Defense was authorized to nominate to the President, who was directed to appoint, an advisory commission, each of whom was to possess special knowledge of some industry, or otherwise be specially qualified in the opinion of the Council for the performance of the duties im-

posed. It was made the duty of the Council to direct investigations and make recommendations to the President and the heads of executive departments, among other things, of data as to amounts, location, method, and means of production, and availability of military supplies, and to give information to producers and manufacturers as to the class of supplies needed by the military and other services of the government, the requirements relating thereto, and the creation of relations "which will render possible in time of need the immediate concentration and utilization of the resources of the nation," and the Council was authorized to adopt rules and regulations for the conduct of its work, which were to be subject to the approval of the President, and was to provide for the work of the advisory commission. U. S. Stat. at Large, vol. 39, c. 418, § 2, p. 649 (Comp. St. § 3115c).

On March 4, 1917, Congress passed the Navy Purchase Act (39 Stat. 1193), which provided as follows:

"(b) That in time of war, or of national emergency arising prior to March first, nineteen hundred and eighteen, to be determined by the President by proclamation, the President is hereby authorized and empowered, in addition to all other existing provisions of law:

"First. Within the limits of the amounts appropriated therefor, to place an order with any person for such ships or war material as the necessities of the government, to be determined by the President, may require and which are of the nature, kind, and quantity usually produced or capable of being produced by such person. Compliance with all such orders shall be obligatory on any person to whom such order is given, and such order shall take precedence over all other orders and contracts therefore placed with such person."

On April 6, 1917, Congress passed a resolution (40 Stat. 1), which was on the same day approved by the President, declaring that a state of war existed between the United States and the Imperial German government. On June 15, 1917, Congress passed the Urgent Deficiency Act which provided as follows:

"(c) To require the owner or occupier of any plant in which ships or materials are built or produced to place at the disposal of the United States the whole or any part of the output of such plant, to deliver such output or part thereof in such quantities and at such times as may be specified in the order. * * *

"Compliance with all orders issued hereunder shall be obligatory on any person to whom such order is given, and such order shall take precedence over all other orders and contracts placed with such person. If any person owning any ship, charter, or material, or owning, leasing, or operating any plant equipped for the building or production of ships or material shall refuse or fail to comply therewith or to give to the United States such preference in the execution of such order, or shall refuse to build, supply, furnish, or manufacture the kind, quantities, or qualities of the ships or materials so ordered, at such reasonable price as shall be determined by the President, the President may take immediate possession of any ship, charter, material or plant of such person, or any part thereof without taking possession of the entire plant, and may use the same at such times and in such manner as he may consider necessary or expedient." U. S. Stat. at Large, vol. 40, pt. 1, c. 29, p. 182 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115$^k$/₁₆d).

On May 22, 1917, one A. Frey, a member of the Knit Goods Committee of the Advisory Board of National Defense, wrote a letter to the plaintiff, in which he stated that the government was in the

market for a quantity of flat wool underwear. He inclosed specifications and asked to be advised as to how large a quantity plaintiff could furnish prior to September 1st and at what price. In his letter he wrote:

"I request you not to write me that you are sold up and cannot furnish any of these goods. I am aware that this condition prevails with every one. * * * I have before me a list of all the manufacturers, with their capacity as figured out by myself according to number of cards, and there should not be any trouble to place this amount within a very reasonable time. It is not the committee's intention to place the whole burden on one mill, but to divide it according to production. * * *"

A similar communication had been sent to other manufacturers of woolen knit goods in Cohoes and Waterford, and on its receipt a meeting of their association was called to consider the matter. All agreed that the letter was intended by the government as a demand, and they sent a representative to New York there to confer with the chairman of the Knit Goods Committee of the Council of National Defense, and to inform him of the quantity they could produce, and still fill all their civilian orders. The plaintiff's proposal was to furnish 10,000 dozens during 1917. The chairman of the Knit Goods Committee increased the amount to 12,000 dozens without consulting the plaintiff. This brought a protest from plaintiff, saying that if so large an order were placed deliveries would have to be made later. To this the chairman replied that, since it was possible to make the large amount, the plaintiff would have to do it. Thereafter regular contract forms were sent to the manufacturers, including the plaintiff, and were signed. The orders thus placed were for the army, and they did not interfere with civilian deliveries; the capacity of plaintiff's mill being sufficient for both the army and the civilian orders. The difficulties arose later, when the order for the navy came in. The capacity of plaintiff's mill for the year 1917 was $33,059^9/_{12}$ dozens, and prior to the navy's order the total civilian and army orders aggregated $31,945^5/_{12}$ dozens.

Then July 2, 1917, the chairman of the Knit Goods Committee wrote the plaintiff that his committee had received an emergency call from the Navy Department, and that it was absolutely necessary that the underwear should be furnished for the use of the sailors on the North Sea Service in the winter, as the underwear in use was too light. He continued:

"This underwear can be made by only a limited number of mills in the country. We have carefully apportioned it among the different mills, and know that we cannot secure the quantity needed unless we can receive from you 25,000 shirts and 25,000 drawers by October 1st, and the same quantity additional by December 1st."

The plaintiff addressed the following letter to the chairman:

"Dear Sir: In reference to the Navy order, would say we have gone over this matter carefully and conservatively, and we find that you have allotted to us about 2,000 dozen more than we can produce in the prescribed time. This is known as a six-set mill, and we can only produce so many dozen per week; we are not as large in size as the Hope Knitting Company or the William Moore Knitting Company.

"In addition to this, we are facing the annual shut-down for one week's vacation during the last week in August, which we do not see any way to avoid, as the help have had this vacation every year for the last 40 years. We are willing to do all in our power to give the government every dozen we can produce within the allotted time, but as we said before, you have allotted to us 2,000 dozen more than we can produce within the time allowed. Wish you would kindly let us hear from you on this matter and oblige."

To this the chairman replied as follows:

"Gentlemen: Your letter of the 19th inst. is at hand. We have telephoned to the Navy Department, suggesting that 12.000 shirts and 12,000 drawers of the Navy underwear shall be canceled from your order, and we shall arrange to transfer that quantity to another mill."

Upon receipt of the Navy order the manufacturers of knit goods at Cohoes, including the plaintiff, again called a meeting and appointed a committee to go to New York and confer with Mr. Cromwell, the Chairman of the Knit Goods Committee of the Council of National Defense. The testimony shows that the committee saw Mr. Cromwell with the following results:

"Q. Will you give us the conversation as near as you recollect it, which occurred with Mr. Cromwell? A. We told him we were in receipt of his letter for emergency wear and we came down to understand it. We explained it would take our entire production for the entire year, if they insisted on us taking this order. His reply was that it was an emergency order and was absolutely necessary to have it. The soldiers were up in the North Sea—

"Q. The sailors, you mean? A. Yes; with very light underwear, freezing to death, and there was no way we could get out of making it, and we had to take our share—he was sorry, but it had to be done. We spoke to him about putting off deliveries of the army stuff to January, February, and March; told him that would help us out with our trade. He said it was absolutely impossible; that the civilian trade would have to wait until the army and navy were taken care of. The committee had notified all its mills to that effect, to set aside civilian business to take care of these orders."

The testimony shows that Mr. Cromwell was the personal representative of Paymaster Hancock, the officer in charge of the purchasing division of the Bureau of Supplies and Accounts of the Navy Department, and it was through Cromwell, as Hancock testified, that the Navy communicated with the plaintiff. There is also testimony that the Secretary of War issued instructions stating that he would hold the army officials responsible for supplying the army, and that they were to leave to the Supplies Committee of the Council of National Defense all of such purchases. So far as army orders were concerned, they appear to have been handled by the several advisory committees of the Council. In the placing of the orders for knit goods there was no contract between the manufacturers and the officers of the army. The manufacturers of knit goods dealt with the Knit Goods Committee and with Mr. Cromwell, who was placed in charge of all army purchases of such goods. This fact needs to be kept in mind in considering the letter from Frey, already referred to; Frey being a member of the committee of which Cromwell was the chairman.

It is not necessary to state all the communications which passed between the plaintiff and those who represented the government; and we see nothing in the record which differentiates the orders placed for the army from those placed for the navy. The plaintiff was alike given to understand that the orders were to have precedence over civil contracts, and that the plaintiff was required to furnish the goods. If one order was compulsory, all were; and if any one was contractual, all the others were. That the issue between the parties to this litigation may be the better understood, we shall refer at some length to the correspondence which passed between them concerning the demand which the government had made upon the plaintiff, and defendant's disposition respecting it.

The navy order was received by plaintiff on July 2, 1917, and two days later plaintiff wrote defendant that the government had taken over its entire plant production for the next six months. This letter defendant replied to on July 16th, and wrote:

"We beg to state that we cannot recognize your authority to cancel any of the goods we have on order with you."

The defendant continued to demand delivery from time to time. Finally, on September 17th, plaintiff wrote defendant, explaining at length the situation in which it had been placed by the government and stating that it would be impossible for it to make any further delivery on defendant's order during the year, adding:

"We dislike to advise you to this effect, but it is only fair that you should be fully informed of the situation. We have no means of knowing whether we will be called upon to make more goods for the United States government, and in consequence, as first stated herein, we are unable to advise when we will be able to make any deliveries."

In reply defendant wrote on September 21st:

"This is to advise you that we hold you liable in damages for any failure on your part to make deliveries in accordance with your contract."

On October 15th defendant wrote:

"Inasmuch as you have failed to comply with your contract with us, we shall ask that you deduct from the amount of our bill the damage which we have sustained by reason of your default."

The plaintiff referred defendant to Mr. Cromwell, chairman of the Committee of National Defense, for any information it desired in regard to the plaintiff's making goods for the government of the United States. To this defendant on October 23d replied:

"Whatever damages are due us, occasioned by your deliberate breach of contract it is now up to you to make good. It is not our wish or desire to drag Mr. Cromwell into this controversy, and we do not understand what he can say which in any way would justify a deliberate breach of the contract on your part."

It appears that plaintiff in the meantime had taken the matter up with Mr. Cromwell, sending to him the correspondence which had passed between it and defendant, whereupon Mr. Cromwell wrote the following letter to plaintiff:

"Knit Goods Committee of the Council of National Defense.

"New York, Oct. 23, 1917.

"Messrs. Moore & Tierney, Cohoes, N. Y.—Gentlemen: We have read the correspondence sent us between you and the Roxford Knitting Company in regard to an unfilled order which you took from them for civilian trade. No business placed by the Knit Goods Committee, nor to the best of our knowledge by any other agency of the Council of National Defense, can be used as an excuse to cancel obligations of civilian trade. All that the government did was to insist that its orders should be given priority in delivery, and that civilian orders, so far as they interfere with the government requirements, should be postponed in delivery.

"Yours truly,                              Lincoln Cromwell,
                        "Chairman Knit Goods Committee."

On October 27th plaintiff again wrote defendant at length a full account of what had been done and said:

"We have not canceled, nor did we intend to cancel, any of our contracts with the civilian trade."

The letter concluded as follows:

"The government is insisting that they are entitled to priority over the civilian trade, and this is exactly what we have advised all our customers, including you, that we are compelled to fulfill first the government requirements, give them priority, and afterwards will furnish the civilian trade."

In reply defendant closed the correspondence on November 2d, writing:

"The reason you assign in your communication we cannot recognize as in any way affecting our contract, either from a moral or legal standpoint."

It thus appears that, notwithstanding the fact that defendant knew that the underwear was absolutely required for the immediate needs of the soldiers and sailors of the United States engaged in the war, and in spite of the fact that it knew that the Council of National Defense had stated that the government must have the goods and have them at once, defendant declined to see in these facts any moral or legal excuse for plaintiff's inability to deliver to it the goods ordered for its civilian trade and business. As respects the first "order," dated June 6, 1917, there appears in the record what is entitled "Contract for Supplies. * * *" It declares that—

"These articles of agreement entered into this 6th day of June, 1917, between Colonel M. Gray Zalinski, Quartermaster Corps, United States Army, of the first part, for and in behalf of the United States of America, and Moore & Tierney, * * * witness that the said parties do hereby mutually covenant and agree. * * *"

As respects the second "order," dated July 25, 1917, it appears that the Navy Department, under date of July 23, 1917, notified the plaintiff that "the following classes in your proposal for naval supplies * * * are hereby awarded you under contract No. 31378," and that in due course a formal contract would be forwarded for execution; and under date of July 25, 1917, the department states that "a contract numbered as stated above (No. 31378), and dated 4th August, 1917, has been entered into with" plaintiff.

As respects the third "order," the War Department, under date of November 15, 1917, notified the plaintiff in writing as follows:

"In accordance with your offer, contract is awarded you 'for furnishing and delivering at the New York depot of this corps. * * *"

Then followed the statement that "this contract will be dated November 16, 1917." This was signed, "H. L. Hirsch, Colonel, Q. M. Corps, in Charge." Then, under date of November 30, 1917, a letter was written to the plaintiff, stating that there was inclosed the "contract" in triplicate, dated November 16, 1917, which plaintiff was requested to sign and return at the earliest practicable date.

As respects the fourth "order," the War Department, under date of December 11, 1917, informed the plaintiff that "in accordance with your offer, contract is awarded you for furnishing to this corps. * * *" Then followed the statement "This contract will be dated December 12, 1917." Prior to the awarding of this contract, and on December 7, 1917, the Committee on Supplies from its New York office wrote the advisory commission of the Council of National Defense, advising "the following purchase" from the plaintiff of the undershirts and drawers in the amounts and prices as they were afterwards included in the award of the contract above referred to under date of December 11, 1917.

All four of the plaintiff's "orders" thus appear in the record as formal contracts, reduced to writing and signed by the contracting parties, with their names at the end thereof. An order, strictly speaking. is a command or a direction. Hence defendant insists that what the plaintiff calls "orders" were not in reality orders, placed pursuant to a commandeering statute, but ordinary voluntary contracts, and it asserts that such contracts made with the government, even in time of war, afford no legal excuse for the nonperformance of civilian contracts and that if such civilian contracts are to be displaced it can be only because some statute has so provided. The National Defense Act has not so provided, but has empowered the President "to place an order," and made "all such orders" obligatory, and provided that "they [the orders] shall take precedence over all other orders and contracts."

The Navy Department devised a form of order which was a command or direction, the first line of which was: "Effective July 1, 1917, please be prepared to furnish. * .* *" It then went on to declare: The particular points "at which deliveries of these items will be called for under this order, as well as the forms of delivery required, are to be, * * *" and "the prices to be paid for such petroleum products as you may be required to deliver are to be determined later." This form of order was not used for the navy contract upon which the plaintiff in this case sues, and which is dated August 4, 1917. And in a letter, dated March 28, 1918, and signed "Hancock, by Direction of the Paymaster General," it is said:

"Contracts for supplies for the navy are made pursuant to sections 3709 and 3718 of the Revised Statutes. * * * When orders are placed under the commandeering power, as delegated to the Secretary of the Navy, by the

President of the United States, a navy order is used to distinguish the same from the usual contract."

The defendant claims that the government proceeded under section 3709 of the Revised Statutes (Comp. St. § 6832). That section provides that all purchases and contracts for supplies in any of the departments shall be made by advertising, when the public exigencies do not require immediate delivery, and adds:

"When immediate delivery or performance is required by the public exigency, the articles or services required may be procured by open purchase or contract, at the places and in the manner in which such articles are usually bought and sold, or such services engaged, between individuals."

It is clearly evident, the defendant says, that the supplies for the army were, so far as this plaintiff is concerned, obtained under section 3709 in the form of purchases entered into by contract, and were not obtained by "order" under a commandeering statute. When the government had to resort to the commandeering power, it used an "order," and the price to be paid was left open, and was to be subsequently fixed. In other cases the matter was put in contract form, and the price to be paid was specified, having been agreed upon in advance. There is not a word in these contracts to show that they are commandeering orders, or were to be regarded as such. Neither is there anything in the record to show that the plaintiff, prior to or at the time of the execution of the contracts, was informed by any one that these writings embodied commandeering orders.

It may be conceded that the plaintiff knew, at the time the correspondence began between it and those representing the government concerning the needed supplies, that the government could commandeer its plant and compel acquiescence with its wishes. It does not follow, because this was known, that any contracts made with such knowledge, even though they may be emergency contracts, are to be regarded as though they were commandeering orders. The statutes do not say that all contracts made with the government in a period of national emergency are to have precedence over civilian contracts. Whether Congress ought to have said so we need not inquire. It is sufficient for us that it has not said so, and that we cannot write into the statutes what Congress has left out of them.

But the question remains whether the fact that the plaintiff signed the contracts submitted to it is decisive of the issue herein involved. The plaintiff contends that the forms used cannot take away the real substance of what occurred between it and the representatives of the government. It contends that, in view of all that passed between the parties, the correspondence and personal interviews, as well as because of the exigencies and emergencies of the army and navy, it believed, and had the right to believe, that in acquiescing in the demands made upon it the plaintiff was obeying commandeering orders, knowing, as plaintiff did, that if it did not yield its assent the government could and would reach its strong hand out and take its mills; and the court below was clearly of the opinion that it was not necessary to use the particular form of order that was adopted, but that an order

obligatory on the manufacturer could be placed in other ways. The learned District Judge, referring to this, said:

"If A., desiring to purchase for family use a bill of groceries required by him, goes to the groceryman, and, ascertaining prices for merchandise to be paid for on request, says, 'Please send to my house the following articles,' naming them, 'required by me,' and the merchant says, 'I will do so,' has not A. placed an order therefor, and one obligatory on the merchant assuming it to be the duty of the merchant to fill orders when given? Would it change the nature or character of a written memorandum of what had occurred? In such case, as here, there would be a valid contract; but can it be said an order was not placed within the ordinary meaning of the words 'place an order'?"

It must be admitted that neither the National Defense Act nor the Navy Purchase Act prescribe any stereoptyped form of order which must be used. An order might be placed under the form and terms of polite request. It is left to the discretion of the government to determine the manner in which orders are to be placed, and how its intentions are to be communicated, orally or by writing. They may be made known by telegram, or by telephone, or by letter. The acts of Congress do not prescribe the method of communication, nor the form of it. In this case the plaintiff was informed by letter and by oral communication that the government *must* have the supplies, that it *must* have them at once, that deliveries *must* take precedence over civilian deliveries, which *must* wait, and that the plaintiff *must* comply with the government's requirements. Under date of October 23, 1917, Cromwell wrote the plaintiff:

"All that the government did was to *insist* that its *orders* should be given priority in delivery, and that civilian orders, so far as they interfere with the government requirements, should be postponed in delivery."

There is evidence in the record to show that the use of the contract form was a matter of departmental routine, and used where compulsory orders had been placed. The officer in charge of the Purchasing Division of the Bureau of Supplies of the Navy Department was asked whether, when he issued "orders" under the commandeering statutes, he used the form which has been set forth in this opinion as one adopted for compulsory orders. His reply was, "Not in all cases." He was then asked, "When you didn't use that form, what did you use?" He replied, "Used the ordinary contract form." He added that he used it without any changes. He was asked, referring to the contract form, "Was that a method employed in your department for ordering goods under these acts (commandeering statutes) that have been referred to?" He answered, "Yes sir." He was asked, "How could an outsider tell whether a formal contract was in fact a naval order, an order under these statutes?" To this he replied, "I don't know, except by developing all the facts surrounding the case." His attention was called to the telegram sent in July, 1917, by the Paymaster General of the Navy to the plaintiff, which read as follows:

"Thirty-eight thousand suits underwear awarded you four dollars thirty-four cents each."

He was asked whether that telegram was a form of "ordering" goods under the statutes (the National Defense and allied acts). His

answer was, "Yes, sir." He also testified that he personally prepared the "order" form, as distinguished from the "contract" form, and that in the thought of the department "the contract was an agreement with regard to the price of the material," and that whether the one form or the other was used was a matter "addressed rather to the sensibilities of the people than to any reason for the application of the authority which Congress gave the department." The court stated that what he understood the witness to mean was that, when an order was given, the department did not in all cases use the "order" form, but that that form was only used in those cases where it was necessary to use it to bring about results. And the witness replied, "That was the custom." The following colloquy took place between the court and the witness:

"Q. Well, you say here—I will read this last clause—'When orders are placed under the commandeering clause as delegated to the Secretary of the Navy by the President of the United States, the navy order is used to distinguish the same from the usual contract.' As I understand you now, that was not done in all cases? A. Not done in all cases, unless we had to resort to the commandeering power. If it came down finally to a power where we couldn't agree on the contract, and the only power we had left was to make them go ahead, then we used the navy order form."

At the time these "orders" were given to the plaintiff it is well to remember that all the conditions which justified a commandeering order existed. From all this the plaintiff claims that the testimony shows that it is not the particular form of agreement which was entered into or the particular notices of award that were given that are the determining feature, but it is the entire transaction between the government and the manufacturer that should be considered, in ascertaining whether the transaction was voluntary on the part of the individual, or whether it was done under the direction of the paramount war power of the government. That the entire surrounding circumstances must be considered to determine whether the formal contract entered into was a voluntary agreement covering the whole matter, or whether it was a mere settlement of details after the manufacturer had been directed to furnish certain material. And it affirmatively appears that the officer in charge of the purchase of supplies for the navy thought he was entitled to use and did use the contract form in cases where the parties on both sides reached an agreement with regard to the price of material. And in this case the parties had reached such an agreement.

[2] It is evident that the plaintiff and the representative of the Navy Department considered that a commandeering or compulsory order was placed. When the Paymaster of the Navy was on the stand, the court said to him:

"They [the plaintiffs] contend, in view of these letters and the war exigencies and the needs of the navy, that they believed and had the right to believe, not only that they were following a commandeering order, but the government had the right so to consider it, and if they had turned around and said, 'We won't take the contract, we won't have anything to do with it,' that the government could have reached its strong hand out and taken their mills."

And the Paymaster replied, "I agree with that point entirely." But after all it is not decisive to ascertain what the plaintiff or the Paymaster thought was being done, or intended to do. The real question is as to what in fact was done. In order that civil contracts should be postponed by "orders" subsequently placed by the government, it is necessary that those orders should be placed in accordance with the commandeering act, if the act indicates the method to be pursued. If officials of the War and Navy Departments entertain erroneous views of their power and of the construction to be placed upon an act of Congress, their decision cannot make it the duty of the courts to perpetuate the error, and override the statute, and deprive individuals of their contract rights. The National Defense Act, as we have seen, does not prescribe the method by which an order shall be placed, beyond providing that the President, through the head of any department of the government, may place an order, compliance with which shall be obligatory and shall take precedence over all other orders and contracts.

We think that under this statute an order need not be signed either by the President or by the head of a department. It is enough that the order is the order of either, and there is a presumption that, when an order is sent out from the appropriate executive department in the regular course of business, such order is with the knowledge and approval of the Secretary, unless the contrary appears. Medkirk v. United States, 45 Ct. Cl. 395, 403 (1910). And the act of a head of a department is in legal contemplation the act of the President. Scott v. Carew, 196 U. S. 100, 109, 110, 25 Sup. Ct. 193, 49 L. Ed. 403. He speaks and acts through the heads of the several departments in relation to subjects which appertain to their respective duties. The Confiscation Cases, 20 Wall. 92, 109, 22 L. Ed. 320; Wilcox v. Jackson, 13 Pet. 498, 10 L. Ed. 264. And see United States v. Eliason, 16 Pet. 291, 10 L. Ed. 968; United States v. Farden, 99 U. S. 10, 12, 25 L. Ed. 267; Wolsey v. Chapman, 101 U. S. 755, 769, 25 L. Ed. 915; Runkle v. United States, 122 U. S. 543, 557, 7 Sup. Ct. 1141, 30 L. Ed. 1167. And as it is impossible that each head of a department should perform in person all the business of his department, the law allows him to act through subordinate agents in his department whose legal power is included in his, just as his is included in that of the President. See 6 Op. Atty. Gen. 583, 587.

The Supreme Court in Williams v. United States, 1 How. 290, 11 L. Ed. 135, declared that the President could not be required to become the administrative officer of every department, or to perform in person the numerous details incident to services which by the Constitution and laws he is required and expected to perform. In that case an act of Congress prohibited the advance of public money in any case whatsoever to the disbursing officers of the government, except under the special direction of the President, and the court held that this did not require the personal and ministerial performance of this duty to be exercised in every instance by the President under his own hand, and never in any respect delegated. A contrary construc-

tion of the law, it was said, would be so fraught with mischief to the public service that it could not be entertained.

The intention of Congress in enacting the National Defense Act and the allied acts was in part to enable the President, acting through the heads of departments, to place compulsory orders for war supplies and materials, and to give to orders so placed priority over civil contracts. No doubt it was desirable, in placing all such orders, to have done so in a writing which expressly stated that the orders were issued under authority of the National Defense Act, and that they were to have priority over all civil contracts. But as no particular form or method was prescribed by the acts, beyond declaring that they should be placed by the President through the heads of departments, and as the heads of departments may ordinarily act through their subordinates, the majority of the court hold that they were entitled so to act in the giving of orders under these acts.

The majority of the court are not inclined to regard the word "order," in the National Defense Act, in the provision which authorizes the placing of orders which are to have priority over civil contracts, as necessarily exclusive of orders which the government has placed and put into a writing which appears to be contractual because a price to be paid is stated therein and signed by both parties. The Century Dictionary defines the verb "order" as meaning:

"To command to be made, done, issued, etc.; give a commission for; require to be supplied or furnished; as to order goods through an agent."

The same authority defines the noun as:

"Authoritative direction; injunction; mandate; command, whether oral or written; instruction: as, to receive orders to march; to disobey orders."

And when a manufacturer is given to understand that he is required to supply certain goods to the government of the United States, and is told that he has no option to decline to comply, we are satisfied that as to those goods an "order" has been placed or received, within the spirit and intent and the letter of the statute, whether the authoritative direction is written or oral, and notwithstanding the fact that the parties actually come to an agreement in what has the form of a contract. Substance is not to be sacrificed in such cases to form.

The fundamental rule and "pole star of statutory construction" is to ascertain and give effect to the intention of the Legislature. In pursuance of that purpose the courts have established the rule that a statute must be construed with reference to the object intended to be accomplished by it, United States v. Musgrave (D. C.) 160 Fed. 700, St. Louis, etc., R. Co. v. Delk, 162 Fed. 145, 89 C. C. A. 169; that the spirit or reason of the law will prevail over its letter, Holy Trinity Church v. United States, 143 U. S. 457, 12 Sup. Ct. 511, 36 L. Ed. 226; Wilkinson v. Leland, 2 Pet. 627, 7 L. Ed. 542; that words in common use are to be construed in their natural, plain, and ordinary signification, Lake County v. Rollins, 130 U. S. 662, 9 Sup. Ct. 651, 32 L. Ed. 1060; that if a legislative intent can unmistakably be gathered from title, text, context, and the background of common knowledge, it is as much a part of the act, as said by the Circuit Court of

Appeals for the Seventh Circuit, as if it were all written out in the clearest words, Ross v. Schooley, 257 Fed. 290, 168 C. C. A. 374.

The majority of the court is also satisfied that the officials of the United States gave the plaintiff to understand that it was required to manufacture .the supplies demanded of it, that it had no right to refuse to comply, and that with this understanding the supplies were furnished. That being so, effect should be given to the intent of the Congress that civil contracts should be postponed to orders compulsorily placed.

Judgment affirmed, in both cases.