Booth, Judge,
delivered the opinion of the court:
The plaintiff is a lumber broker, conducting an extensive business from Baltimore, Md. During 1917 it had a number of contracts with foreign lumber brokers in Great Britain to supply them with a vast quantity of spruce and fir *322 lumber to be used in airplane manufacture. The plaintiff had been particularly fortunate in procuring from the lumber mills in the west millions of feet of the lumber specified in its contracts, and had either in its possession or in transit at the time this controversy arose 301 cars of lumber. This suit is for the recovery of the difference between the sum it actually received from Great Britain, France, and Italy for the 301 cars and the.market value of the lumber at the time it was sold, an aggregate sum of $163,247.17. Bight of recovery is predicated upon an alleged verbal commandeering of the lumber by the United States.
Prior to our entry into the war accredited representatives of Great Britain, France, and Italy came to this country, being charged, among many other duties, with the procurement of spruce and fir lumber for airplane construction. As soon as the United States became involved in the war, a critical situation with respect to this particular war commodity arose. The allied countries had outstanding contracts, and, the needs of the United States becoming acute, it became a question, in view of the limited supply and abnormal demand, as to what should be done. The conflicting interests of the several countries brought about confusion, or as was said by the British representative, “ the spruce situation was attended with complications.” To solve the attending difficulties, some time in August, 1917, the spruce production division of the Signal Corps of the Army was organized. Colonel Brice P. Disque was put in charge and stationed at Portland, Oregon. September 7, 1917, the Secretary of War, acting in pursuance of the act of June 3, 1916 (39 Stat. 166) the national defense act, dispatched to all the mills producing spruce and fir an order to proceed with all possible haste in the performance of Government contracts, and to give them preference irrespective of outstanding contracts or obligations to any other parties except the Navy Department. In December, 1917, Major Lead-better was assigned to the spruce production section of the spruce production division of the Signal Corps and became thereby in charge of the allocation of airplane lumber among the allied countries and the United States, the representa *323 tives of Great Britain, France, and Italy having consented to discontinue the practice of procuring lumber by independent contracts and to thereafter order and procure it through the spruce production division of the Signal Corps and to limit the issuing of transportation permits to this division alone. The plaintiff, when the order of September 7, 1917, came to its attention, never having received official notification and appearing not to have known of it until January 16, 1918, became much alarmed over its status with respect thereto. On the above date it wrote to the British war commissioner, setting forth its predicament as to obtaining the necessary supplies to perform its contracts abroad, and suggested a way to afford it relief. At this time it had a large quantity of lumber either in its possession or on board the cars for shipment. The British commissioner advised it at once that the subject matter was under the exclusive control of the United States and that the allied countries were cooperating and would continue to cooperate with the spruce production division of the Signal Corps of the Army, Major Leadbetter’s department, volunteering, however, to use his good offices in securing permits for shipment of so much of plaintiff’s supply then in cars or transit. The plaintiff on February 5, 1918, communicated by letter with Major Leadbetter, for-warded a copy of the same to the British commissioner, and subsequent to the receipt of two additional letters from the commissioner, Major Leadbetter requested the plaintiff to come to his office. On February 11,1918, this conference was held. In addition to the plaintiff and Major Leadbetter, Major Harris, the law officer of the division, and the representatives of Great Britain, France, and Italy were present and took part in the proceedings. The plaintiff was informed by Major Leadbetter that the United States Government had taken control of the spruce and fir lumber situation and that it would be expected and would have to consent to the delivery of its lumber in accordance with his, Major Leadbetter’s, instructions. The plaintiff first protested, asserting mainly its contractual liability to private lumber brokers abroad, and apparently from the record the principal subject under discussion was the most feasible and lawful way which might be devised to enable *324 the plaintiff to accede to the conditions and grant it immunity from loss from this source. It was evidently conceded that Great Britain, France, and Italy were to receive the lumber as per allocation, and there was some discussion between Major Leadbetter and the plaintiff as to Major Lead-better’s commandeering the entire lot. No formal or written order to this effect was ever issued or served upon the plaintiff. On the contrary, Major Leadbetter on February 18, 1918, mailed to the plaintiff priority certificate 6707, issued by the Council of National Defense, authorizing the delivery of the lumber at once, and thereafter the plaintiff, in pursuance of agreements so to do, made between itself and Great Britain, delivered the lumber to Great Britain, acting for the Allies, and received in full the agreed price from Morgan & Company, New York bankers, representing Great Britain in financial affairs in this country. The United States never received, used, or were ever called upon at the time to pay for any portion of this lumber sent abroad and allocated by the officers of the Signal Corps to Great Britain, France, and Italy.
The plaintiff rests its case primarily on an alleged verbal order of commandeering. This order it asserts was positively given by Major Leadbetter during the conference of February 11, 1918. In this respect the case is decidedly unique. We do not hesitate to say that even in the absence of being called upon to reconcile the conflicting statements with regard to this precise matter we would be exceedingly loath to impose a substantial liability upon the defendant upon mere spoken words, especially so when the whole conduct of the parties, from beginning to end, negatives an intention to requisition and leaves us no more to rest the facts upon than the mere statement of one party, positively and emphatically contradicted by the other.
The United States in the exercise of its war powers specifically granted by various acts of Congress sometimes requisitioned and on other occasions consummated the transaction by following a peremptory order with express contracts between the parties for the supplying of the materials. As a general rule it was the policy of the Government to contract where possible, and when contracts fol *325 lowed the order the relationship between the contractor and the Government was determined by the contract, despite the necessary degree of compulsion which created it. American Smelting & Refining Co. v. United States, 259 U.S. 75. In other words, if the manufacturer or dealer accepted the order and subsequently contracted as to price and delivery, the contract precluded the recovery of more than the contract price. The peremptory character of the order and forced obedience thereto protected the party upon whom it operated from liability for breach of existing contracts with third parties. Omnia Commercial Co. v. United States, 261 U.S. 502; Roxford Knitting Co. v. Moore & Tierney, 265 Fed. 177.
What was done by the Government in this case was the customary and usual proceedings indispensable to marshaling the lumber resources of the Nation, stimulating production, and supervising the equitable distribution of the supply among the countries at war. We will not advert to the necessities of the proceeding. It is sufficient to observe that the plaintiff fell in whole-heartedly, after some slight hesitation caused by its anxiety over private contracts, with the program and followed it implicitly. It submitted to government control of its -vast holdings of spruce and fir. Of course, what was done eventuated in its failure to perform its private contracts, to what extent is somewhat problematical, for, notwithstanding the degree of restraint imposed upon it, conditions were far from favorable to the accomplishment of private consignments of merchandise by rail, and trans-Atlantic transportation without governmental consent was practically impossible. In the end the Government of the United States allocated the plaintiff’s lumber to Great Britain, France, and Italy, and by a proper order placed it in a position to negotiate its sale with and secure its delivery to them. This the plaintiff did. It entered into contracts, and notwithstanding the date of their signature, it did not then, nor does it now, disclaim that these three countries failed to pay it the full amount agreed upon. The contracts in the record were voluntarily executed. Without this formality it would not have received payment from these countries for the lumber. Even pre *326 ceding that transaction the plaintiff had inventoried the lumber to Great Britain, then representing our foreign allies; and the history of the transaction upon well-settled business principles governing the same unmistakably points to the fact that the plaintiff was fully aware with whom it was dealing and the source from which payment for its wares was to come. So, as a matter of fact, we believe the plaintiff’s lumber, whatever may have been its status in the beginning of governmental control, was not requisitioned by the United States, but, on the contrary, it was eventually granted freedom of contract as to price; that it did so contract and has received the amount agreed upon from the parties with whom it contracted. We need not cite authorities to sustain our position. The question has been many times adjudicated and the authorities are quite familiar.
In addition to what has been said, the authority of Major Leadbetter to commandeer has not been shown. The order of September 10, 1917, on its face, precludes the exercise of the power, except upon the conditions prescribed therein. The record is silent in this respect. The officer must be clothed with authority to act, and his authority must be shown. B. & O. R. R. Co. v. United States, 261 U.S. 592.
The petition will be dismissed. It is so ordered.
Graham, Judge; Hay, Judge; Downey, Judge; and Campbell, Chief Justice, concur.