# WILSON AND COMPANY

*vs.*

## JOHN CURLETT.

*Sale of Canned Goods—Failure of Crop—Arbitration Clause—
Requisitioning by Government.*

A clause, in a contract for the sale of packed tomatoes, excusing the vendor from making full delivery if prevented from so doing by "destruction of factory or other providential hindrances beyond his control," applied if the fulfillment of the contract was prevented by rain and early frost, making it impossible to procure tomatoes for packing purposes in that section of the country.                            pp. 150, 151

Plaintiff vendor having testified that it was, by reason of the frost, impossible for him to procure tomatoes with which to fill the contract, the question of such impossibility was properly left to the jury.                            p. 152

A clause in a contract, providing for arbitration of disputes, does not require an arbitration as a condition precedent to an action to enforce the contract, unless it is so expressly provided by the contract or is necessarily implied from its terms.                            p. 153

A stipulation that "all disputes under this contract shall be arbitrated in the usual manner" does not *prima facie* require the parties to submit to arbitration their ultimate right to the enforcement of the contract, when this contains various provisions to any of which such stipulation might apply. pp. 153, 154

A vendor of goods is not liable for failure to make delivery, if this was rendered impracticable by reason of the Government's requisitioning of the goods under statutory authority.
                            p. 155

That the vendor of tomatoes to be packed by him received a notice, purporting to have been issued by a committee acting "with the Council of National Defense," and instructing the canners of the United States to reserve for the Government eighteen per cent. of their pack of tomatoes, coupled with evi-

dence that the Government sent its agent to the vendor's factory to warn him to reserve eighteen per cent. of his pack in accordance with said notice, and later took eleven hundred cases of the tomatoes from the warehouse in which they were stored in his name, justified a finding that such eleven hundred cases were requisitioned by the Government.                    p. 156

*Decided January 12th, 1922.*

Appeal from the Baltimore City Court (DAWKINS, J.).

Action by John Curlett against Wilson and Company, a corporation, for the purchase price of canned tomatoes. From a judgment for plaintiff, defendant appeals.    Affirmed.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*J. Purdon Wright* and *Paul R. Kach,* for the appellant.

*Edward M. Hammond,* with whom were *Karr, Hammond & Darnall* on the brief, for the appellee.

THOMAS, J., delivered the opinion of the Court.

This appeal is from a judgment of the Baltimore City Court recovered in the short note case against the appellant in an attachment proceeding.

In 1917 the appellee, John Curlett, was engaged in the canning business in Morattico, Virginia, and on the 5th of January of that year he entered into a contract, through his brokers or agents, W. E. Robinson & Co., of Belair, Maryland, with the appellant, to sell the appellant three thousand cases of "No. 3 hand packed tomatoes" at $1.05 per dozen, f. o. b. Morattico, Virginia, to be delivered when packed during the season of 1917.    Among the provisions of the contract were the following:

> "Destruction of Factory, etc.—Seller not respon-
> sible for full delivery if prevented from making same
> by destruction of factory, or other providential hin-
> drances beyond his control.
>
> "Disputes—All disputes under this contract shall be
> arbitrated in the usual manner, and the decision of the
> arbitrators shall be final, each arbitrator to be paid
> $5.00 and necessary expenses, cost of arbitration to be
> paid by the loser."

Including the contract with the appellant, the appellee had contracted to pack and sell during that season in all 8,500 cases of tomatoes. In addition to those planted on his own land, he had contracted with farmers in the neighborhood of his factory for one hundred and seventy-five acres of tomatoes, and had made all other necessary arrangements, including the purchase of cans, for packing 15,000 cases. Beginning in July, 1917, and continuing through a period of forty days, there were frequent and very heavy rains, which resulted in reducing the tomato crop to the extent of one-third, and about the 18th of September there was a very early frost, which destroyed the tomatoes and put an end to canning for that season. Notwithstanding the damage to the crop by the heavy rains, the appellee confidently expected to have more than enough to meet all his contracts, but in consequence of the frost, which does not usually occur in that section of Virginia until about the last of October, the appellee canned only about 5,000 cases. Prior to the frost the appellee shipped about 3,000 cases to parties with whom he had contracted, including 600 cases shipped to the appellant, but after the frost, when the appellee realized that he would not be able to supply the full amounts called for in his contracts, he shipped the balance of his pack, consisting of about 2,000 cases, to the "Terminal Warehouse" in Baltimore City for storage in his own name, for the purpose of meeting a demand made upon him by the Government, and pro-rating the balance among those with whom he had contracted. In June, 1917, the "Committee on Canned Foods,"

said to be acting "with the Council of National Defense and the various Departments of the Government," notified all canners that they were required to reserve eighteen per cent. of their pack of tomatoes, subject to the order of the Government, for the use of the Army and Navy. The appellee received a copy of this order or notice, and the Government also sent inspectors to his factory to warn him that he was required to reserve eighteen per cent. of his pack for the use of the Government. Of the 2,000 cases which the appellee shipped to the warehouse for storage, the Government took 1,100 cases, for which the appellee received $1.70 per dozen, or $3.40 per case, and 685 cases were shipped to the order of the appellant. The appellant paid for the 600 cases shipped by the appellee in September, but refused to pay the contract price of the 685 cases, claiming that it was entitled to damages from the appellee by reason of his failure to ship the 3,000 cases contracted for.

This suit was brought to recover the contract price of the 685 cases, and interest thereon, and during the trial, which resulted in a verdict and judgment in favor of the plaintiff for $1,518.44, the defendant reserved forty exceptions, all of which relate to rulings on the evidence, except the last, which was to the granting of plaintiff's two prayers and the rejection of defendant's first, second, third and fifth prayers.

The contentions of the appellant are, as stated in their brief:

"1. That the clause of the contract between the parties excusing the appellee from making full delivery in the event of 'destruction of factory or other providential hindrances beyond his control' did not excuse him from making full delivery by reason of crop failure due to a heavy rainfall followed by an early frost, under the circumstances found in this case.

"2. That the appellee had no right to proceed into court with his case without first offering to comply with the arbitration provision of his contract, which

reads: 'All disputes under this contract shall be arbitrated in the usual manner, and the decision of the arbitrators shall be final.

"3.   That there was no warrant in law for the action of the appellee in delivering tomatoes to the Government at the expense of those persons, including the appellant, who held contracts with him for his 1917 pack."

In support of the first contention, counsel for the appellant argue that, under the familiar rule *ejusdem generis,* the words "other providential hindrances" cannot be held to include "hindrances" due to heavy rainfalls or early frost mentioned in the evidence, and they say:   "If his factory were destroyed, his facilities for canning tomatoes would vanish, and it is apparent that he could not possibly fulfill his contract.   In like manner, if there were an actual commandeer by the Government as a war measure of the tomato crop in the entire United States sufficiently close to his cannery not to permit him to purchase fruit on the open market and transport it to his cannery without rotting, he might be relieved, although of course, it would not be a 'providential hindrance.'   So, a total failure of the tomato crop throughout the eastern section of the United States might relieve him of responsibility."   In the plaintiff's first prayer the court instructed the jury that the words, "providential hindrances beyond his control," used in the contract mean "such acts only as may be attributed to the act of God, and not to mere unavoidable causes, such as accident resulting from and attributable to human conduct"; and counsel for the appellant say in their brief that the prayer contains the proper definition of the terms of the contract.   But they insist that the act of God relied on must be such as "prevented" the fulfillment of the contract, or rendered fulfillment *impossible.*   Even if we were to accept this view as being strictly correct, when we turn to the evidence we find that the appellee testified in chief that after the frost in September "it was impossible to get any tomatoes, * * *

That he tried to get tomatoes sufficient in amount to enable
him to pack but was unable to do so," and on cross-examina-
tion he said that there was not a single acre of tomatoes in
"my whole section of the country that was not contracted for
in 1917," and that he tried to find some tomatoes that were
not contracted for and failed. With this evidence before
the jury the court could not have directed a verdict for the
defendant on the ground that there was no evidence legally
sufficient to show that the *hindrance* caused by the rains and
early frost *prevented* the fulfillment of the contract, and so
far as this feature of the case is concerned there was clearly
no error in the rejection of the defendant's first prayer, which
asked the Court to direct a verdict in its favor. According
to the evidence in the case, prior to the frost mentioned there
was no reason why the appellee should have made any fur-
ther provision for the necessary supply of tomatoes, and
whether the statement of the appellee that "it was impossi-
ble" to get any tomatoes after the frost was true was a
question of fact for the jury to determine under proper in-
structions. We cannot go to the extent indicated by the case
of *Newell* v. *New Holstein Canning Co.,* 119 Wis. 635. In
the case of *Jenkins* v. *Spedden,* 136 Md. 637, where the suit
was brought against the packer to recover for his failure to
deliver the number of cases of tomatoes which he contracted
to deliver to the plaintiff, CHIEF JUDGE BOYD said, on page
645, in reference to plaintiff's second prayer: "Their second
prayer was clearly objectionable on several grounds. It
utterly ignored any other contracts the defendants had, and it
gave the jury no information as to what would be proper
diligence under the circumstances for the defendants to ex-
ercise. The jury may have thought that notwithstanding the
failure-of-crop clause, if the defendants could have purchased
tomatoes elsewhere, regardless of the place and price, it was
their duty to do so. They were not so required under our
construction of the contract."

The second contention of the appellant is based upon the
clause of the contract referring to arbitration. This defense

was not made by a special plea, but assuming that it was not waived by the defendant by going to trial on the merits of the case, and the agreements of counsel in the record (*Franklin Fire Ins. Co.* v. *Chicago Ice Co.,* 36 Md. 102; *McEvoy* v. *Harn Co.,* 129 Md. 93; 2 *R. C. L.* 364; 5 *C. J.* 46), the clause does not expressly provide that arbitration is a condition precedent to the right to sue on the contract. It is said in 2 *R. C. L.* 363; "But the courts generally will not construe an arbitration clause as ousting them of their jurisdiction unless such construction is inevitable, and consequently when the arbitration clause is not made a condition precedent by express words or necessary implication, it will be construed as merely collateral to the liability clause, and so no bar to an action in the courts without an award." See also 5 *C. J.,* p. 45. In the case of *Hamilton* v. *Home Ins. Co.,* 137 U. S. 370, the Court said: "A provision in a contract for the payment of money upon a contingency that the amount to be paid shall be submitted to arbitrators, whose award shall be final as to that amount, but shall not determine the general question of liability, is undoubtedly valid. If the contract further provides that no action upon it shall be maintained until after such an award, then, as was adjudged in *Hamilton* v. *Liverpool, London & Globe Ins. Co.* (136 U. S. 242), above cited and in many cases therein referred to, the award is a condition precedent to the right of action. But when no such condition is expressed in the contract, or necessarily to be implied from its terms, it is equally well settled that the agreement for submitting the amount to arbitration is collateral and independent; and a breach of this agreement, * * * cannot be pleaded in bar to an action on the principal contract." See also *Green* v. *American Cotton Co.,* 112 Fed. 743. The contract in question contains a number of provisions under which disputes might have arisen, and the clause in question was doubtless intended to cover such disputes. There is nothing in the agreement to indicate that the parties intended to submit to arbitrators their ultimate right to the enforcement of the agreement.

and even if it be assumed that an express stipulation to that effect would be sustained by the courts (*Allegre v. Maryland Ins. Co.,* 6 H. & J. 408; *Insurance Co. v. Morse,* 20 Wall. 445; *The Excelsior,* 123 U. S. 40; 13 *C. J.* 457), we cannot hold that such right is covered by the clause referred to, so as to make arbitration a condition precedent to a suit for the enforcement of the contract. In the case of *Baltimore City v. Schaub Bros.,* 96 Md. 554, where the contract contained the clause:

"Water Engineer to interpret contract. The contractors agree that the Water Engineer is to interpret the terms and conditions of this agreement, and the specifications accompaning; and in event of any dispute as to the meaning of any of the provisions and clauses of same, the decision of the Water Engineer is to be final," JUDGE PEARCE said: "Questions as to the size, kind or quality of the coal delivered, as to the points of delivery, the correctness of the weights or analysis, or other kindred questions, would seem to be within the scope of this provision, but not the ultimate legal right of the parties to the enforcement, or the termination of the contract."

In respect to the third contention of the appellant, it would seem, in view of the evidence in the case, only necessary to call attention to the acts of Congress vesting in the President the authority to requisition foods, &c., and to place orders with any company or manufacturing industry for such products or material as may be required. Section 10 of chapter 53 of the Acts of 1917 (40 U. S. St. at L., 279) provided: "That the President is authorized, from time to time, to requisition foods, feeds, fuels, and other supplies necessary to the support of the Army and the maintenance of the Navy, or any other public use connected with the common defence," and section 120 of chapter 34 of the Acts of 1916 (39 U. S. St. at L., 213) provided: "The President, in time of war or when war is imminent, is empowered, through the head of any department of the Government, in addition to the present authorized methods of purchase or procurement, to

place an order with any individual, firm, association, company, corporation, or organized manufacturing industry for such product or material as may be required. * * * Compliance with all such orders for products or material shall be obligatory on any individual, &c., * * * and shall take precedence over all other orders and contracts theretofore placed with such individual," etc.　In 5 *Page, Contracts* (2nd Ed.), sec. 2760, it is said: "A contract for the sale of specified wheat to be delivered in the war is discharged by the fact that the Government has requisitioned such wheat.　Under a statute which provides that compliance with the Government orders shall be obligatory and that such orders shall take precedence over all other orders and contracts, a prior contract is discharged if a Government order has been placed which takes up so much of the capacity of the manufacturing plant that performance of the prior contract is impracticable."　In support of the first statement the learned author cites *In re Shipton* (1915), L. R. 3 K. B. 676, and the cases of *Moore v. Roxford Knitting Co.*, 250 Fed. 278, and *Mawhinney v. Millbrook Woolen Mills*, 172 N. Y. Supp. 461, are cited in support of the second.　Very full notes upon the subject, with a review of the cases and a statement of the principle upon which they rest, are found in 8 *British Ruling Cases*, 507, and 3 *A. L. R. Ann.* 21, and interesting discussions of the effect of war regulations upon the performance of contracts are found in 32 *Harvard Law Review*, 789, and 35 *Law Quarterly Review*, January, 1919.　We do not understand the appellant as seriously questioning the effect of a requisitioning by the Government of the subject matter of a contract, but counsel for the appellant earnestly contend that the notices sent to the plaintiff and other canners, offered in evidence, were not shown to have emanated from or to have been authorized by lawful authority, or, as stated in their brief, "the appellant contends here, as it did in the court below, that there had been no commandeering of tomatoes by the Government, and that there was absolutely no warrant for the appellee delivering the tomatoes to the Gov-

ernment at the expense of the persons holding contracts for
1917 pack." For a very interesting discussion of what
amounted to a legal order or requisition by the Government
during the recent war reference may be had to the case of
*Moore* v. *Roxford Knitting Co., supra.* See also page 796
of vol. 32 of *Harvard Law Review.* The appellee testified
that he had received a copy of the notice offered in evidence.
If the evidence had gone no further, there would have been
more force in the contention of the appellant. But the ap-
pellee further testified that the Government also sent in-
spectors to his factory to caution him to reserve eighteen per
cent. of his pack for the use of the Government, and that
after the frost had stopped his canning, he shipped the
balance of his pack, consisting of 2,000 cases, to the "Termi-
nal Warehouse" in Baltimore "for storage" in his own name,
and that thereafter "The Government stepped in and took
them" from the warehouse, and he "had nothing to do with
it." Assuming that the written notice or bulletin sent to the
appellee, purporting to have been issued by a committee act-
ing "with the Council of National Defense," and addressed
to the canners of the United States, instructing them to
reserve eighteen per cent. of their pack of tomatoes for the
use of the Government, was not shown to have been issued by
those lawfully authorized to do so, when it is coupled with
the evidence that the Government sent its agent to the appel-
lee's factory to warn him to reserve eighteen per cent. of his
pack in accordance with said notice, and later actually took
1,100 cases of the tomatoes from the warehouse in which
they were stored in the appellee's name, the Court would not
be justified in holding that there is no evidence in the case
to show that the 1,100 cases were requisitioned or commen-
deered by the Government.

At the conclusion of the evidence the plaintiff offered two
prayers, both of which were granted, and the defendant
offered six, of which the fourth and fifth were granted and
the others rejected. No objection is urged against the plain-
tiff's second prayer, and his first prayer simply instructed

the jury as to the meaning of the words "providential hindrances beyond his control" used in the contract. It is suggested by the appellant that the first prayer was defective in that it did not instruct the jury in regard to the extent to which the plaintiff was under obligation to secure the tomatoes necessary to meet his contract. But the prayer was confined to the meaning of the words referred to, and did not attempt to instruct the jury as to the facts necessary to entitle the plaintiff to recover. It was not misleading, and it was not incumbent upon the plaintiff to ask for the instruction suggested.

The defendant's first prayer sought to withdraw the case from the jury, and was properly refused for the reasons we have already stated. Defendant's second prayer proceeded upon the theory that the defendant was entitled to set off against the plaintiff's claim the difference between the contract price and the market price of the 1715 cases which the plaintiff failed to deliver, and to a verdict for the difference, provided the jury found that the failure of the plaintiff to deliver the 1,715 cases "was not caused by any of the causes provided for in" the contract: and concluded with the instruction: "by the words quoted from the contract in this prayer is meant the destruction of the factory or a similar cause, and does not excuse fulfillment of the contract because of crop failure," and is disposed of by what we have said in reference to the first contention in the appellant's brief.

Defendant's fifth prayer asked the court to instruct the jury that if they found that the plaintiff delivered 1,100 cases to the Government at $1.70 per dozen, and delivered but 1,285 cases to the defendant, and that the total contracts of the plaintiff amounted to 8,500 cases, then the defendant was entitled to set off against the plaintiff's claim the difference betwen the contract price of 1,100 cases "and the price of $1.70 per dozen at which the 1,100 cases aforesaid were delivered to the Government on 776 dozen." What the defendant meant by the words "on 776 dozen" we are unable to determine from the evidence. If the defendant was entitled

to set-off against the plaintiff's claim the difference between the contract price of the 1,100 cases taken by the Government and the $1.70 per dozen which the Government allowed for them, it was entitled to set-off sixty-five cents per dozen on 2,200 dozen, or $1.30 per case on 1,100 cases. The reference therefore to 776 dozen was clearly erroneous and would have been misleading, and the prayer was properly rejected.

The defendant's fourth prayer, which was granted by the court, instructed the jury that if they found that the plaintiff delivered the 1,100 cases of tomatoes mentioned to the Government at $3.40 per case, and failed to deliver to the defendant "the whole quantity mentioned in its contract with the plaintiff to the amount of 1,715 cases," then the defendant was entitled to set off against the plaintiff's claim the $1.30 additional profit made by the plaintiff on the 1,100 cases, and by the defendant's granted sixth prayer the jury were told that as it appeared from the evidence that the plaintiff did not deliver to the defendant "his proportionate share of the 1917 crop, * * * the defendant is entitled to recover the difference between the contract and market prices on the difference between 1,285 cases of tomatoes and 47% of 3,000 cases, or 1,410 cases less the 1,285 cases delivered, making 125 cases, at the time they were to be delivered and to set off this amount against the plaintiff's claim."

The remaining thirty-nine exceptions are, as we have said, to the rulings of the court on the evidence. To discuss these exceptions separately would prolong this opinion beyond all reason. Some of the exceptions are to evidence admitted subject to exceptions, some to questions that do not appear to have been answered, and others to evidence which was subsequently admitted without objection. We have carefully examined each exception. Some of the evidence objected to was clearly inadmissible, but we do not find serious or reversible error in any of the rulings, and will therefore affirm the judgment of the court below.

*Judgment affirmed, with costs.*