# TIDEWATER PORTLAND CEMENT COMPANY

## *vs.*

## S. DANA LINCOLN.

*Sales Contract—Exclusive Territory—Government Orders—*
*War Conditions.*

The action of a manufacturing company in accepting government orders cannot be regarded as entirely voluntary, when such action was taken under the effective compulsion of war conditions then existing and of vital considerations of national policy and patriotic duty, and since, moreover, by force of the National Defense Act and similar legislation, the manufacturing plant could have been commandeered by the Government.

pp. 198, 199

A manufacturing company, in accepting and executing, during the war, priority orders from the Government, was not exercising an option, within a contract between it and an individual, which gave it the option of making sales within the territory controlled by such individual, on paying to the latter a commission on such sales.

p. 200

Where a sales contract, made before the war, between a manufacturing company and an individual residing in the District of Columbia, provided that the latter should purchase from the former a named amount of its product during the year, at the price prevailing in the District at the time each order should be placed, and furthermore, while giving such individual exclusive rights in the District, authorized the company to make sales on paying to him a named commission, *held* that the latter clause did not apply to sales made directly to the Government after the beginning of the war, even conceding that it might have applied irrespective of whether the materials sold were to be delivered within or without the District.

pp. 201, 202

It can hardly be supposed, in the absence of specific evidence of renewal, that a commission agreement, as to the effect

of which the parties were not in accord, was mutually designed
to be continued in force beyond the period to which it was lim-
ited by its own terms, especially when the exigencies of war
had radically changed the conditions with reference to which
the commissions had been originally proposed.          p. 203

On issues as to whether the seller's failure to make full
deliveries was due to railroad embargoes, or to the failure of
the purchaser to give orders for shipments, or to his directions
that deliveries be suspended, *held* that the evidence was suffi-
cient to go to the jury.                               p. 203

*Decided January 10th, 1923.*

Appeal from the Baltimore City Court (DAWKINS, J.).

Action by the Tidewater Portland Cement Company
against S. Dana Lincoln, trading as the National Mortar
Company. From a judgment for defendant, plaintiff ap-
peals. Reversed.

The cause was argued before BOYD, C. J., BRISCOE,
PATTISON, URNER, STOCKBRIDGE, and ADKINS, JJ.

*Vernon Cook* and *William J. O'Brien,* for the appellant.

*Daniel Thew Wright* and *William L. Rawls,* for the ap-
pellee.

URNER, J., delivered the opinion of the Court.
The Tidewater Portland Cement Company, the appellant
in this case, is engaged in the manufacture of cement at
Union Bridge in Carroll County, Maryland, and the appellee,
trading as the National Mortar Company, is a dealer in ce-
ment operating in the City of Washington. On January 27,
1916, in continuance of previous relations of the same nature,
a contract was executed by which it was agreed that the
appellee should purchase from the appellant fifty thousand
barrels of cement between the date of the contract and the

end of the current calendar year, in quantities not exceeding ten thousand barrels in any month. It was stipulated that the purchases of cement, thus agreed to be made, should be "at the market price, in carload lots, prevailing" in the territory covered by the contract, "at the time each order for cement" was "placed by the buyer with the seller." Article 11 of the agreement provided: "That the territory covered by this contract is the District of Columbia, in which territory the buyer has the exclusive right to the sale of Tidewater Portland Cement during the life of this contract." On January 28, 1916, the appellant wrote the appellee a letter stating: "With further reference to contract entered into between the National Mortar Company and the Tidewater Portland Cement Company, dated the 27th day of January, 1916, and with particular reference to Article 11 of said contract, it is hereby mutually agreed and understood that should at any time the Tidewater Portland Cement Company desire to sell cement in said territory, that they may do so without violating any of the terms or conditions of this contract, upon payment by the Tidewater Portland Cement Company to the National Mortar Company of a commission of fifteen cents per barrel." Upon this letter was noted the appellee's acceptance.

For the year 1917 a sales agreement was executed in substantially the same form, so far as the questions here involved are concerned, as the one applying to the prior annual period. By notation of both parties upon the letter just quoted its terms were "extended to cover the year 1917." The transactions between them in respect to the sale of cement continued until the midsummer of 1918, but without the execution of a sales contract for that year. At the time of the severance of their trade relations, the appellee was indebted to the appellant in an amount conceded at the trial below to be $32,205.90, for cement and unreturned sacks. Payments had been withheld by the appellee, to the total amount stated, because of his larger claims for commissions, under the terms of the letter referred to, and for damages resulting from the

alleged breach by the appellant of its agreements with the appellee for the sale and delivery of cement. The pending suit was brought by the appellant, and it has been contested solely upon the basis of the appellee's counter-claims, which were asserted by appropriate pleas. The appeal is from a judgment for $10,000 rendered in the appellee's favor in pursuance of the verdict of a jury. This result was equivalent to a recovery in the sum of $42,205.90, as the judgment was for an amount demanded by the appellee in excess of that admitted to be due the appellant.

The most interesting and important of the questions raised by the numerous exceptions in the record depend for decision upon the construction and application of the agreement relating to commissions on sales made by the appellant, in derogation of the appellee's exclusive selling rights, in the District of Columbia. All of the sales upon which the commissions are claimed were made by the appellant to the Government of the United States. A large proportion of the cement thus sold was delivered and used beyond the territory to which the appellee's contractual right of sale was limited. The whole of the material supplied by the appellant to the Government was ordered and required for purposes essential to the prosecution of the war with Germany. When the commission agreement upon which the appellee relies was entered into the nation was at peace. Every one of the transactions to which the commission claim refers was produced by the exigencies of war. The primary and decisive inquiry is whether the agreement is applicable to the subsequently developed and abnormal conditions with respect to which it is sought to be enforced.

The National Defence Act, of June 3rd, 1916 (Comp. St. S. 3115 g), authorized the President, in time of actual or imminent war, to place orders, through the head of any department of the Government, for such products or material as might be required. It was provided that compliance with such orders should be obligatory, and that they should take precedence over all other orders or contracts. A similar

provision was contained in the Navy Purchase Act of March 4th, 1917 (39 St. at L., 1193). By the Urgent Deficiency Act, of June 15, 1917 (U. S. St. at L., vol. 40, pt. 1, c. 29, p. 182), it was provided that "the owner or occupier of any plant in which ships or materials are built or produced" could be required "to place at the disposal of the United States the whole or any part of the output of such plant, to deliver such output or part thereof in such quantities and at such times as may be specified in the order," and that compliance with an order issued under the act should be obligatory upon any person to whom it was given, and any such order should "take precedence over all other orders and contracts placed with such person." The act further declared that if any person owning or operating a plant equipped for the production of material should refuse or fail to comply with an order thereby authorized, or to give preference to the United States in its execution, or should refuse to supply or manufacture the kind and quantities of materials ordered, at such reasonable prices as should be determined by the President, immediate possession of the whole or a part of such plant or material might be taken by him for use at such times and in such manner as he might consider necessary or expedient.

The deliveries of cement by the appellant to the Government were in fulfillment of orders and contracts resulting from allocations of such material made by the Portland Cement Committee, one of the agencies organized by the Council of National Defense in the exercise of its authority to provide "in time of need" for "the immediate concentration and utilization of the resources of the Nation." (U. S. St. at L., vol. 39, c. 418, S. 2 p. 649.) Cement was required in large quantities for various construction purposes essential to the government's war measures. The plant of the appellant was so located as to be one of the most convenient sources of supply for a number of highly important military projects. The quantities of cement furnished by the appellant for such purposes aggregated 277,534 barrels.

When cement was needed for a particular project the Government would apply to the Portland Cement Committee, which would report as to the district and plant where it should be obtained. The order would then be placed by the agency requiring the material. The prices were determined by the Federal Trade Commission and were lower than the prevailing commercial rates. An industry failing to fill government orders would have been liable to the commandeering action authorized by statute, and in any event, would have been seriously impeded in its operations by reason of the priority in transportation and fuel supply awarded to enterprises which were helping to meet the nation's military necessities. If the appellant corporation had refused to sell and deliver the cement on account of which commissions are here claimed, it is practically certain that it would have been incapable of performing any substantial part of its sales contract with the appellee to which the commission agreement was incidental. His orders for cement to be used for municipal and public service construction work were filled according to his contract with the appellant, except for certain interruptions to which other questions in the case are attributable. The appellee himself could not have procured and filled the orders to which his claim for commissions relates, as it was the definite and declared policy of the Government to obtain supplies for war purposes direct from the manufacturers, and not to deal with middlemen except for emergency purchases in comparatively small quantities.

Some of the government orders on the appellant were in terms compulsory, and these were excluded by the trial court from consideration by the jury. Upon the theory that the remaining orders were voluntarily accepted, the court permitted them to be considered by the jury as a basis for the claim of commissions. It appears from the evidence that, except for objections to some navy orders which disregarded the prices fixed by the Federal Trade Commission, the appellant willingly complied with the Government's requests. In some instances the orders were embodied in contracts which

the appellant freely executed, and there is evidence that it was interested in securing increased allocations for its plant. But the urgent importance of the work it agreed to perform was thoroughly understood and repeatedly emphasized. While the appellant's acceptance of specific orders may in a sense have been voluntary, its action was taken under the effective compulsion of war conditions then existing and of vital considerations of national policy and patriotic duty. The only alternative for the appellant would have been to assume an attitude which might have caused its plant to be commandeered, which certainly would have deprived it of the regular fuel supplies and transportation service upon which its operation depended, and would have made impossible the very transactions in regard to which the appellee's commission claim is asserted.

In the case of *Mawhinney* v. *Millbrook Woolen Mills,* 231 N. Y. 290, it was held that when, during the period of the war with Germany, the Government of the United States made contracts for cloth, and requested through its army officers that delivery be made as promptly as possible and in precedence over other business, such orders were obligatory on a contracting manufacturer, within the spirit and meaning of the National Defense Act, and afforded sufficient excuse for failure, thereby caused, to comply with the orders of a civilian customer. Answering the contention that acceptance of the Government contract was not obligatory, the Court of Appeals of New York said: "The willingness and desire of a manufacturer to serve the Government under such circumstances and conditions in preference to civilian trade cannot be presumed to be a mere desire to profiteer. But, whether it be or not, it is the Government we must think of and its necessity for preservation; it needed equipment at once and this required that all else be laid aside irrespective of the motive of the manufacturer in complying. The one who gave his service with alacrity under such conditions should at least be considered with as much favor as he who held back until threatened or his property commandeered. The laggard who

feared the financial results under his civilian contracts merits no encouragement. The fact that the defendant may have sought and welcomed the government work is immaterial. The fact is the Government gave it orders which had to be filled at once. The Act of Congress, the necessity of the times, brooked no delay."

In the decision of a similar question in *Roxford Knitting Co.* v. *Moore & Tierney* (C. C. A.), 265 Fed. 177, it was held that the obligatory and preferential character of an order, under the National Defense Act, to supply goods to the Government, is not necessarily affected by the fact that it is in the form of a contract.

The suspending or discharging effect upon existing contracts of the exercise of the Government's requisitioning power in time of war was recognized in *Wilson & Co.* v. *Curlett,* 140 Md. 147.

But the question now under consideration is not whether the compliance by the appellant with the war-time orders of the Government impaired any of the appellee's contractual rights. It is upon the very fact of such compliance that the appellee's commission claim is sought to be supported. The contention here is that if the acceptance by the appellant of the government orders can be regarded as voluntary, then the appellee is entitled to commissions on account of such transactions under the agreement upon which he relies. Our judgment is clear that in accepting and executing the orders in question the appellant was not exercising an optional right, under its agreement with the appellee, to make sales in the designated territory, upon the payment to him of the stipulated commission, but was discharging a duty to which the agreement was subordinate and was rendering a service which the appellee himself was not in a position to perform.

In the preceding discussion of this phase of the case we have assumed the correctness of the appellee's theory that, if his commission claim is valid, it applies to all of the appellant's sales of cement for government use, regardless of the place of delivery, because the authority under which the

material was ordered had its origin in the District of Columbia, within which the appellee's right to sell the appellant's product was agreed to be exclusive. It has been assumed also that the agreement as to this right, and as to the commission to be paid if it were not fully observed, was effective during the whole of the period covered by the sales in controversy. But on behalf of the appellant it is contended, with much force and reason, that neither of those assumptions is valid.

The successive annual sales contracts between the appellant and appellee provided that the prices of the cement delivered should be those prevailing in the District of Columbia when specific orders under the contract were received. This strongly suggests a purpose to confine the effect of the contract to sales and deliveries in that locality. In accordance with the regular course of dealing between the parties, when cement was ordered by the appellee for a particular project, in regard to which he had made a successful bid to furnish such material, a separate contract therefor was executed by himself and the appellant, and deliveries made under its terms were credited on their general sales agreement then in force. There were occasions prior to the war when the appellee, at the appellant's instance, made bids, which were accepted, to supply cement for government work at the Norfolk and League Island Navy Yards, and at Indian Head and Annapolis, Maryland. But the prices stipulated in the contracts between the appellant and appellee for the cement to fill such orders varied with the places of delivery. They were evidently not controlled by the provision in the annual agreements that the District of Columbia sales, in regard to which the appellee was to have exclusive rights, should be for the market prices prevailing within the territorial limits of the District. It would seem, therefore, that the sales of cement for delivery in other localities should not be declared to be within the effect of contracts with the terms of which they were not consistent. If, however, the contractual rights of the appellee to sell the appellant's cement in the District of Columbia, and to be

paid a commission of fifteen cents per barrel on all cement sold by the appellant itself in that area, should be held to be ordinarily enforceable with respect to all deliveries for government use at other places, we are clearly of the opinion that such rights could not be asserted or exercised under the extraordinary conditions which developed subsequently to the agreement relied on and which it obviously did not contemplate.

There is testimony in the record to the effect that the general sales manager of the appellant orally stated to the appellee his purpose, which was not in fact accomplished, to have the 1917 sales contract rewritten and executed with a view to having it apply to the year 1918. It was not testified that any such reference was made to the letter containing the commission agreement. But the continued course of dealings between the parties is said to have had the effect of renewing for another year their prior contractual relations. The only orders from the appellee to the appellant in 1918 were under specific contracts between them for the sale and delivery of cement which the appellee had agreed to supply in the District of Columbia for municipal projects and for construction work of public service corporations. In reference to the commission agreement, the appellee had written a letter to the appellant on October 8, 1917, claiming to be entitled to a commission of fifteen cents per barrel on all cement sold by the latter to the Bureau of Supplies and Accounts of the Navy Department. To this letter the appellant, two days later, replied: "In order that there may be no misunderstanding in regard to this matter we beg to advise that this company will pay you your commission in accordance with your contract on all business that we sell the Government in the territory covered ·by your contract, but on such business as is commandeered by the United States Government we are going to make no promise; it will depend very largely on what we are able to do with the Government." Replying to a letter from the appellee, dated November 6, 1917, the appellant wrote the next day as follows: "Your valued favor of the 6th instant

received in regard to alleged commissions due you. Kindly advise specifically, giving particular and definite reference as to what you base your claim on. If a contract, advise the clause and any other information that will enable us to definitely locate your ideas in regard to the same. On receipt of this information it will afford us pleasure to advise you further." The record does not refer to any reply to this letter. It thus appears that, prior to the expiration of the 1917 contract, the question as to the existence and extent of the appellee's right to commissions had been raised and was unsettled. In the first of the appellant's letters just quoted its recognition of liability for commissions was clearly intended to be confined to its *voluntary* sales *in the territory covered* by the contract. It can hardly be supposed, in the absence of specific evidence of renewal, that a commission agreement, as to the effect of which the parties were not in accord, was mutually designed to be continued in force beyond the period to which it was limited by its own terms, especially since the exigencies of war had radically changed the conditions with reference to which the commissions had been originally proposed.

Upon the undisputed and decisive facts of the case we are of the opinion that the appellant was entitled to the instructions which it requested, but which were refused, precluding recovery by the appellee under the set-off pleas in which his claim of commissions was asserted.

This conclusion disposes of the question raised as to the action of the trial court on eighteen of the appellant's twenty-four prayers, and on five of the fourteen prayers which the appellee submitted. The other prayers as to which any point is made were concerned with the appellee's counter-claim of damages on account of the alleged breach by the appellant of specific contracts for the sale and delivery of cement in stated quantities. In opposition to this claim it was urged that the only omissions to make full deliveries were due to railroad embargoes, or to the failure of the appellee to give orders for shipments, or to his directions that deliveries be suspended.

As to the questions of fact thus raised the evidence was such as to warrant their submission to the jury. Except that there is a partial inconsistency between the appellant's seventh prayer, and the appellee's seventh and eighth prayers, all of which were granted, and that the appellee's seventh prayer disregards the grounds on which defaults in deliveries might be excused, and that the appellee's granted fourteenth prayer misconstrues the contract to which it refers, we find no error in the action on the prayers relating to this branch of the case.

There are twenty exceptions to rulings on the admissibility of evidence. In so far as they are not covered by our decision on the question of commissions, they disclose no reversible error. As it will be necessary to reverse the judgment and remand the case for a new trial, it is unnecessary to consider exceptions taken to the action of the trial court in sustaining objections to proffers, in support of a motion in arrest of judgment, to prove by three of the jurors, who had been impaneled in the case, that their verdict for $10,000 in favor of the appellee was understood and intended to be simply credited on the appellant's claim for $32,205.90, and not to be in excess and discharge of that conceded indebtedness.

*Judgment reversed, with costs, and new trial awarded.*