## UNITED STATES v. BUTTERWORTH-JUDSON CORPORATION et al.

(Circuit Court of Appeals, Second Circuit. February 18, 1924.)

No. 134.

1. **United States ⬰73—Advance payment to contractor for war supplies does not create agency.**

Under Act Oct. 6, 1917, § 5 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 6648a), authorizing the Secretary of War and Secretary of the Navy to "advance payments" to contractors for war supplies, "provided that such advances shall be made upon such terms as the Secretary of War and the Secretary of the Navy, respectively, shall prescribe and they shall require adequate security for the protection of the government for the payments so made," advances so made are, as provided in plain language, "advance payments" for supplies purchased and thereafter to be delivered, and neither Secretary had authority to retain title to the money advanced and to make the contractor agent of the government for its disbursement.

2. **United States ⬰73—Advance payment to contractor on contract for war supplies held to create relation of debtor and creditor only.**

The War Department contracted with a corporation for the manufacture and delivery of a large quantity of picric acid, and by a supplemental agreement under Act Oct. 6, 1917, § 5 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 6648a), made an advance payment to the contractor of $1,500,000, to be repaid with interest by credits on deliveries of picric acid, with a proviso that it might be repaid at any time, "as collateral security for the recoupment or return of the above-mentioned advance." The contractor was required to give its demand note for the amount with 6 per cent. interest and a performance bond; the note not to be used except on default under the principal contract, in which case it might be sold or enforced and the proceeds applied to repayment of so much of the advance as was unpaid, and any balance to be accounted for to

⬰For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the contractor. It was provided that the money advanced should be deposited in special accounts in banks to be drawn upon by the contractor only in payment for construction and equipment of the plant or for other expenditures required in the direct performance of the principal agreement. By such agreement the United States was to pay for and own the plant and site and to reimburse the contractor for expenditures made thereon. *Held*, that the supplemental contract created no relation of trust or agency between the parties, but only that of debtor and creditor.

**3. Words and phrases—"Revolving fund" defined.**

"Revolving fund" is a brief expression which usually refers to a renewable credit over a defined period, and in simple parlance it relates usually to a situation where a banker or merchant extends credit for a certain amount which can be paid off from time to time and then credit is again given not to exceed the same amount, and it may also mean a fund, which, when reduced, is replenished by new funds from specified sources.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by the United States against the Butterworth-Judson Corporation, its receivers, and others. From the decree, complainant and certain defendants appeal. Affirmed.

Appeals from a final decree dismissing the complaint and dismissing the counterclaim contained in the answers of certain of the defendants.

The suit is brought by the United States for an accounting against Butterworth-Judson Corporation (hereinafter called Butterworth Co.), and its receivers, under a contract called "Principal Agreement," dated May 9, 1918, by which Butterworth Co. contracted to manufacture picric acid for the United States, and under a "Supplementary Agreement," dated May 22, 1918, by which the United States made advance payments to the contractor by authority of the Act of October 6, 1917, chapter 79, section 5 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 6648a) quoted in the margin.[1]

There were certain banks in which Butterworth Co. deposited moneys paid to it by the United States.

On April 22, 1922, a suit was brought against Butterworth Co. and an order was entered by which, inter alia, receivers were appointed. Certain loans had been made to Butterworth Co. by the banks, and, as these loans had not been repaid, the banks, in view of the receivership, exercised what they claimed to be their right by setting off against these loans the balance to the credit of Butterworth Co. in certain special accounts which had been set up pursuant to the Supplementary Agreement, supra.

The banks referred to in the title of the suit were therefore made defendants, and various surety companies also mentioned in the title were likewise made defendants as they had become sureties for the proper performance by Butterworth Co. of the principal and supplementary agreements, supra.

On one side of the controversy, therefore, are the United States and the surety companies and, on the other side, are the banks. At one time during the litigation, the receivers felt it their duty to be on the side of the United States, but because of certain decisions not relevant here, the receivers are now indifferent.

---

[1] "Section 6648a (Act Oct. 6, 1917, c. 79):

"5th. Advances of Public Moneys to Contractors for Supplies by Secretaries of War and Navy.

"The Secretary of War and the Secretary of the Navy are authorized, during the period of the existing emergency, from appropriations available therefor to advance payments to contractors for supplies for their respective departments in amounts not exceeding thirty per cent. of the contract price of such supplies: Provided, that such advances shall be made upon such terms as the Secretary of War and the Secretary of the Navy, respectively, shall prescribe and they shall require adequate security for the protection of the government for the payments so made."

The banks moved to dismiss on the ground that on the face of the complaint there was not a cause of action in equity. The counterclaims set up by the receivers in their answer and by the surety companies in their answers were based on facts substantially similar to those set forth in the complaint of the United States.

Appropriate motions to dismiss were made in respect of the counterclaims thus set forth in the various answers. The court below granted the motions to dismiss the complaint and the counterclaims and thereupon entered its final decree.

The further necessary facts will appear infra.

William Hayward, U. S. Atty., of New York City (Victor House, Sp. Asst. U. S. Atty., of New York City, of counsel), for the United States.

Henry C. Willcox, of New York City (Allan C. Rowe, of New York City, of counsel), for appellants surety companies.

Breed, Abbott & Morgan, of New York City (William C. Breed and Edward J. Redington, both of New York City, of counsel), for appellee National Newark & Essex Bkg. Co.

White & Case, of New York City (David Paine, of New York City, of counsel), for appellees Chase Nat. Bank and New York Trust Co.

Cardozo & Nathan, of New York City (Michael H. Cardozo, Jr., of New York City, of counsel), for appellee American Exchange Nat. Bank.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

MAYER, Circuit Judge (after stating the facts as above). The contractual relations between the United States and Butterworth Co. were due to war emergency, and the principal and supplementary agreements were possible only because of and under statutory enactment.

[1] The Secretary of War had only the power which the statute conferred upon him. That statute quoted supra used simple words of well-defined meaning in the law and, for that matter, in everyday commercial relations. It seems almost elementary to state that "advance payments" means payments in advance for things purchased and thereafter to be delivered. "Advance payments" to contractors for supplies can mean nothing else than that the Secretary of War or the Secretary of the Navy, as the case might be, was authorized to arrange with contractors for supplies and within the statutory limit·to pay these contractors in advance for these supplies. But we need not rely upon our general knowledge of these very simple words. It early became the policy of the United States to prohibit "advance payments."

By the statute of January 31, 1823 (3 Stat. at Large, 723, U. S. Comp. Stat. § 6647), it was provided, in part, that "No advance of public money shall be made in any case whatever." From time to time the practical necessities or requirements of administration required some advances of public moneys, and to meet such necessities or requirements statutes were enacted to deal with the particular subject-matter involved. Thus, in this early act of 1823, the President was authorized to make certain advances to the disbursing officers of

the government and also advances to persons in the military and naval service employed on distant stations. The Department of Agriculture, the Forest Service, the Immigration Service, and the Quartermaster Corps, and various executive departments are permitted to "pay in advance" in certain circumstances for certain limited purposes. U. S. Comp. Stats. 6649, 6650, 6651, 6652a, and 6652c.

In these statutes, the words used are "pay in advance" or "paid in advance," or words of import similar to the words "advance payments" used in the statute here under consideration.

The reason for the enactment of the statute now under discussion was plain. It was vital to the United States that many kinds of supplies be manufactured and/or furnished as speedily as possible. The United States was not itself a manufacturer of or dealer in the necessary supplies, and it was obvious that it must arrange with many persons to furnish these supplies. Munitions and ingredients therefor were among the most important supplies needed in large amounts and needed quickly. Evidently, it was clear to the Congress that many contractors would not have the means for building appropriate plants and producing supplies in the required quantities unless they received direct financial aid from the United States. This situation familiar to all was the occasion and necessity for the enactment of the Act of October 6, 1917, chapter 79. The case of The Floyd Acceptances, 7 Wall. 666, 19 L. Ed. 169, had held the statute of 1823 to rigid adherence. The Supreme Court had said, at pages 676 and 677 of 7 Wall. (19 L. Ed. 169):

"We have no officers in this government, from the President down to the most subordinate agent, who does not hold office under the law, with prescribed duties and limited authority. And while some of these, as the President, the Legislature, and the judiciary, exercise powers in some sense left to the more general definitions necessarily incident to fundamental law found in the Constitution, the larger portion of them are the creation of statutory law, with duties and powers prescribed and limited by that law."

Thus it became essential "during the period of the existing emergency" that the statute of 1823 should be superseded by definite enactment which would permit what that statute prevented.

The Secretary of War and the Secretary of the Navy were charged under the statute of 1917 with requiring "adequate security for the protection of the government for the payments so made." This language is also simple and familiar. It usually refers to bonds or undertakings or to some property lodged as security for due performance with him who advances the payments.

The statute also required that the advances should be made "upon such terms as the Secretary of War and the Secretary of the Navy, respectively, shall prescribe."

It will be noted that the authorization to make advance payments was with this proviso. In other words, the statute first created the authority and then required, as a condition of its exercise, the two provisions, (1) as to terms and (2) as to security.

It is clear that it was not the legislative intent to create between the United States, acting through the proper Secretary, and the contractor, the relation of principal and agent. Such a relation primarily would

have possibly opened the way for claims against the United States, either under some existing statutes (Judicial Code, § 24, par. 20, and section 145 [Comp. St. § 991, par. 20, 1136]) or, if there were no applicable statutes, then under all the possibility of subsequent enabling legislation by which claims against the United States could be made and trials had either in the United States District Courts or in the Court of Claims.

The very use in the statute of the word "contractors" indicates at once a contractual relation and not a relation of principal and agent.

We may also assume that the Congress was familiar with the ordinary affairs of business in respect of which, within proper limits, courts may take judicial notice.

When dealing with large affairs, where contractors must make prompt payments for labor and supplies, they usually borrow money in order to carry on the enterprise in hand and, obviously, the contractor, who entered into an agreement with the United States for the furnishing of supplies and to whom the United States made advance payments under these statutes, would gain the credit and the increased ability to borrow money which it might otherwise not possess. The Congress in dealing with the war emergency was more concerned with the practical purpose of obtaining necessary supplies than it was with considering fine legal distinctions which, while the emergency existed, would have arrested production by failing to put contractors in the very funds which were necessary to carry out the purposes of the United States.

To assist him, inter alia, in dealing with the extensive and difficult task of determining to whom to make advance payments and in what amounts and under what terms and security, the Secretary of War had the aid of a War Credits Board created pursuant to duly authorized executive authority.[2]

[2] Since the argument Assistant United States Attorney House at our request has obtained for us a photostat copy of the original order of the Secretary of War dated April 22, 1918, creating the War Credits Board. We think we may notice this order by way of argument, for it is an interesting evidence that the practical construction of the statute by the Secretary of War is in harmony with our construction. We quote infra parts of this order, italicizing some significant provisions. Special attention is called to the provisions under the heading "Terms."

In respect of subdivision (f) under the heading "Security," it is apparent that, under some circumstances, it was desired that the funds advanced were to be definitely procured to be held in trust until paid out under the contract. The theory of this provision necessarily was that the funds should be advanced and that arrangements should be made with the contractor by which these funds should be placed in trust and, obviously, the trustee was not to be and could not be either the United States or the contractor. The provision was solely by way of security and apparently contemplated that the funds advanced should be placed in the hands of some third party under a definite trusteeship and plainly the very purpose of such a trusteeship as security was inconsistent with any right, such as that in the case at bar, on the part of the contractor to draw against the funds advanced by the United States. Under this subdivision (f) ordinarily the fund would be held in trust to be paid out by the trustee, i. e., the third party, against appropriate vouchers or in accordance with some similar procedure. It is interesting to note

that in the supplementary agreement article VI is not designated as collateral security and that "collateral security" is dealt with in article IV.

"From:        The Secretary of War.

"To:          War Credits Board.

"Subject: Duties of the Board.

"1. Authority to advance payments to contractors for supplies is devolved upon the Secretary of War by section 5 of Public Act 64, Sixty-Fifth Congress, approved October 6, 1917. * * *

"2. The Secretary of War has constituted a Board, with authority as stated below, to be known as the War Credits Board. * * *

"3. The said Board is ordered to hear and determine applications for advances of money to contractors, and in my name to instruct the appropriate contracting and financial representatives of the War Department to make and to contract to make advance payments by authority of the said act, under the following rules and restrictions, which have reference especially to the language of the act following the word 'Provided.'

"I. Security.

"The Board will carefully investigate the security offered for the advances, and will see to it that the same be adequate for the protection of the government.

"The language of the act, in respect of the adequacy of the security, contemplates that the government shall be adequately protected by the aggregate of (a) the direct financial responsibility of the contractor, and (b) the additional security required to be taken. The extent to which such security is required, therefore, varies inversely with the direct financial strength of the contractor; and it follows, that advances to responsible contractors will be adequately secured by a relatively small amount of additional security.

"As to the form of security: The Board *may* accept as security the following:

"(a) Obligations or guaranties of responsible individuals or corporations— as, notes or indorsements on notes; bonds, single or conditional; or other contractual guaranties.

"(b) Stocks, bonds, receiver's certificates, certificates of deposit, warehouse receipts and other negotiable muniments of title; properly indorsed for transfer.

"(c) Mortgages, trust deeds, assignments or other instruments conveying title to property. Conveyances of property should vest such property in the Secretary of War or in an Assistant Secretary, or his nominee, as trustee with authority to reconvey.

"(d) Other equivalent security: In general, in respect of the form that equivalent security may take, the Board is instructed that:

"(e) The government is a preferred creditor in bankruptcy and therefore, if the contractor be prohibited from alienating or incumbering his property to others than the government, such prohibition may be substantially equivalent to incumbrance or alienation in the government's favor.

"(f) Similar considerations govern advances made under *such* conditions and restrictions that the *funds advanced are definitely* procured to be held in trust until paid out under the contract, for property to which the government holds or automatically acquires title, or in meeting expenses incurred in the direct performance of the contract for supplies.

"II. Terms.

"(a). Recoupment of advances, by the government: Recoupment shall be *provided for, by original or supplemental contracts, in such manner that the money advanced may be returned by delivery of its equivalent in supplies under the contract during the life thereof.*

"(b) *Interest.* The Board will require interest to be paid on the outstanding balances of all advances, payable in supplies; but the Board may waive interest in cases where in its opinion the government will obtain the equivalent thereof in another form. When interest is required it will be charged at rates to be determined by the Board responsively to financial conditions.

* * * "

[2] The principal agreement was executed by the United States by Col. McRoberts, acting for the United States, under the authority of the Chief of Ordnance, United States Army, and under the direction of the Secretary of War.

This document, executed May 9, 1918, was entitled "Contract for 72,000,000 Pounds of Picric Acid." It recited the state of war which existed between the United States of America and the German and Austro-Hungarian governments and that "the United States requires performance of the work and delivery of the supplies hereinafter described within the shortest possible time." The United States through its officers realized, of course, that picric acid could not be manufactured without an appropriate plant, and it was therefore provided that "the contractor shall promptly select a site * * * for the construction and operation thereon of a plant of the character hereinafter described for the production of picric acid."

After this site was approved in writing by the contracting officer with reference to location, title, and price, it was to be conveyed to the United States, and the United States was to pay the price of the site. The contractor within the shortest possible time was to submit to the contracting officer, i. e., McRoberts, for approval the necessary plans and specifications for a fully equipped plant.

There are other details not necessary to recite, but all of which were in aid of accomplishing a result whereby picric acid to the amount of 72,000,000 pounds should be manufactured.

The contracting officer upon the delivery of this contract of May 9, 1918, was to recommend to the War Credits Board that it approve an advance payment to the contractor for the supplies "herein contracted for" in the sum of $1,500,000 "upon such terms and conditions and secured in such manner as said Board shall prescribe."

The supplementary agreement between Butterworth Co. and the United States, dated May 22, 1918, is entitled "Covering Advance Payment to Contractor." It states that it is supplemental to the contract of May 9, 1918, and recognizes that under that contract "the contractor agreed to deliver supplies consisting of picric acid to the government on the terms specified in the principal agreement."

It then provides in article II:

"In the interest of both parties hereto and in order to expedite the delivery of the said supplies, the government shall advance to the contractor under the principal agreement, an amount not exceeding the sum of one million, five hundred thousand dollars ($1,500,000), on the terms and security hereinafter mentioned, and shall make payment by check directly to the contractor."

Under article III the contractor is to account to the government for the amount of the advance with specified interest "by applying and crediting the said advance with interest to the payment of vouchers presented by the contractor to the government, covering the *delivery of picric acid* under the principal agreement as follows. * * * *" Then follows the details, all of which indicate that the only purpose for which the advance payments were to be made was to obtain picric acid as soon as possible.

In subdivision 3 of this article is the significant provision:

297 F.—62

"The contractor may, at any time, *repay* to the government in cash, the entire outstanding balance of said advance with interest due thereon."

It is then provided that if the government "does not recoup the total amount of the advance with interest due or if the contractor shall not furnish to the government the supplies in whole or in part thereof as provided in the principal agreement, the contractor shall return to the government on demand any balance of the said advance."

Article IV, which is of much importance in interpreting this agreement, requires, "As collateral security for the recoupment or return of the above-mentioned advance and any interest due," the contractor shall furnish (a) its demand note for $1,500,000 with interest at 6 per cent. payable to the Secretary of War on behalf of the United States and (b) a performance bond in the sum of $750,000.

The government was not to negotiate nor demand payment of this note so long as the contractor was not in default under the agreement; but, if he failed to comply with the terms of the agreement, the government could sell the note at public or private sale, with or without notice to the contractor, and could itself become the purchaser "free of all trusts and claims whatsoever" and apply the net proceeds to the *repayment* of the above-mentioned advance and interest due thereon and *accounting* to the contractor, for the balance if any."

On the complete performance by the contractor, the government was to return the note and bond.

Passing the question of the power under the statute of the Secretary of War to create any other relation than that of debtor and creditor, it is difficult to imagine an agreement which has more completely the indicia of that relationship.

The payment of interest, the giving as collateral security of a note and a bond for performance, the requirement that the secured party shall account for the disposition of collateral, the provision that the party to whom an advance is made may at any time repay with interest the balance outstanding, are all characteristic of perfectly simple daily business transactions which are neither enveloped in mystery nor embarrassed by over-refined legal discussion.

1. *The Trust Fund Theory.* The theory of the United States is that a trust fund was created. The agreement lacks every essential element of a trust fund and that conclusion is so plain that we are content to rest with the excellent definition in Brown v. Spohr, 87 App. Div. 522, 529, 84 N. Y. Supp. 995, 998, where the court, per Laughlin, J., said:

"There are four essential elements of a valid trust of personal property: (1) A designated beneficiary; (2) designated trustee, who must not be the beneficiary; (3) a fund or other property sufficiently designated or identified to enable title thereto to pass to the trustee; and (4) the actual delivery of the fund or other property or of a legal assignment thereto to the trustee with the intention of passing legal title thereto to him as trustee."

In this case, there is neither designated beneficiary nor a designated trustee who is not the beneficiary. Butterworth Co. was to receive payment for picric acid and not to hold the fund in trust for the United States or any one else. If the Secretary of War, via War Credits

Board, had the power to create a trust for purposes of security, the agreement did not so provide.

2. *The Revolving Fund Theory.*

. It is pointed out by appellants that in both agreements, there were two parts, i. e., that relating to the building of the plant and that relating to the manufacture and delivery of picric acid; that, after depositing "in special accounts in banks, separate from its other funds" (a provision referred to more fully infra), Butterworth Co. was to draw "on said accounts only in payment of expenditures made and obligations incurred in designing, constructing and equipping the plant * * * and for other equipment and for material, labor and overhead expense required in the direct performance of the principal agreement."

Under article VI of the principal agreement, the United States was to pay all cost and expenses for constructing and equipping the plant, while the contractor (under article VII) was to receive $1, or, in other words, nothing; but the contractor was to make necessary expenditures, and upon presentation of satisfactory evidence that expenditures had been made, the United States was to reimburse the contractor.

It is argued that article VI of the supplementary agreement, quoted in the margin,[3] read with article VI of the principal agreement supra, evidences the fact that there was created only a "revolving fund" to be used in the erection of the plant and negatives the intention that the $1,500,000 should be an advance payment.

[3] "Revolving fund" is a brief expression of recent coinage which usually refers to a renewable credit over a defined period. In simple parlance, it relates usually to a situation where a banker or merchant extends credit for a certain amount which can be paid off from time to time, and then credit is again given not to exceed the same amount. It may also mean a fund which when reduced is replenished by new funds from·specified sources.

But whether these definitions are correct or not, there is no occasion to be confused by phrases when the relations of parties are clearly defined in written agreements.

The fund here was not a so-called revolving fund. What the government agreed to do was to advance $1,500,000 and to provide for repayment by credits on deliveries of picric acid. There was no provision

[3] "Article VI. The contractor shall deposit the money advanced hereunder in special accounts in banks, separate from its other funds, and shall draw on said accounts only in payment of expenditures made and obligations incurred in designing, constructing and equipping the plant specified in the principal agreement, and for other equipment and for material, labor and overhead expenses, required in the direct performance of the principal agreement, unless otherwise authorized in writing by the War Credits Boards.

"The contracting officer may require that the contractor shall deposit in said accounts funds paid by the government to the contractor reimbursing the contractor for expenditures made from this advance in designing, constructing and equipping the plant, as provided in article VI of said contract between the parties hereto, dated May 9, 1918.

"The contractor shall secure from the banks with which such accounts are placed, such interest as is usually allowed for similar accounts and shall credit or pay said interest to the government in such manner as the contracting officer may direct."

that the credit should remain $1,500,000, renewable from time to time as picric acid was furnished. As soon as, under the scheme of the agreement, the full amount of $1,500,000 had been repaid, to the government, with interest, by deliveries of picric acid, then the transaction was closed, and thereafter deliveries of picric acid were to be paid for as made. (Article XII of the principal agreement.)

The method of repayng to the contractor the cost of construction work as set forth in article VI of the principal agreement was devised in order to put the contractor in funds for building a plant and for other purposes of the agreement, but the fund was to pay for picric acid and nothing else.

Plainly, the building of the plant was necessarily incidental to the main purpose, i. e., the production of picric acid, and the adoption of the contention of the appellants would mean that the Secretary of War, in the sound performance of a high duty, had violated the provisions of the statute and without warrant had caused to be paid out moneys of the United States. Such a holding would, in effect, have prevented the Secretary of War or the Secretary of the Navy, as the case may be, from creating machinery under the statute by which he could obtain needed supplies where it was necessary first to build a plant. On the contrary, the two agreements were well drawn and safeguarded the rights of the United States with the result that the title of the plant was vested in the United States and, as happened in other instances, the production of the supplies became unnecessary after the Armistice in November, 1918, and the United States exercised the power of cancellation reserved in the agreement.

3. *The Effect of the Special Accounts.*

This point is largely concerned with the construction of article VI of the supplementary agreement, quoted supra, when construed, as it must be, with the context of both agreements having in mind their purposes and the method of routine set forth.

Appellants constantly refer to the requirements under article VI as calling for a special deposit. As stated in Michie on Banks and Banking, p. 1286:

"A special deposit is one in which the depositor is entitled to the return of the actual thing deposited and the title remains in the depositor."

While "special accounts" may have a different meaning from "special deposits," the test is to be found, not so much in mere words, as in the intention of the parties as enlightened by their written agreements. Primarily, however, we repeat that, under this statute, there was no power to keep the title of "advance payments" in the United States. So to do would have impaired the very purpose of the statute and obviously would have been impracticable.

Under the proviso of the statute, however, the Secretary of War could prescribe terms, and we have referred to the terms he did prescribe. He had large power to determine what was adequate security, and it must be assumed that the security he required which did not include the creation of a trust and the terms he imposed were then deemed adequate to protect the United States.

But again laying aside the question of power and looking only at what was actually done by the agreement of the parties, such as the right to repay, the requirement of the collateral security, and the other arrangements described supra, we consider that the case is clearly ruled by our own decision in Re Interborough Consolidated Corp., 288 Fed. 334, affirming (D. C.) 277 Fed. 249, certiorari denied 262 U. S. 752, 43 Sup. Ct. 700, 67 L. Ed. 1215. Some of the questions here presented were so exhaustively considered by Judge Rogers in his opinion for the court in that case that we need merely add that nothing more clearly indicates the differentiation between a deposit which constitutes a trust fund and one which does not than the respective state of facts in the case of In re Interborough Consolidated Corp. (D. C.) 267 Fed. 914, and the case in 288 Fed. 334.

We see no justification for applying to the funds on deposit any doctrine of trusts or equitable lien or equitable assignment.

Decree affirmed, with half costs to each appellee against appellants other than the United States.