## Hall's Estate

*Joseph P. Brennan*, Assistant United States Attorney, for exceptant.

*Gerritt E. Gardner*, contra.

SMITH, P. J., April 13, 1936.—The funds for distribution, as appears from the report of W. A. Titsworth, Esq., auditor, are proceeds of the executors' sale of real estate for the payment of debts of the decedent, $1,539.28, and proceeds of personal property, $39.57, which total $1,578.85.

Against this was presented for allowance for priority and first preferred payment the claim of the United States of America, for and on behalf of the Governor of the Farm Credit Administration, for $110.08, with interest from November 1, 1933. The claim was founded upon a crop mortgage loan, originally $300 but reduced by payments to $110.08, and was presented by the Reconstruction Finance Corporation, for which, by order of

the President of the United States, the present claimant above named was substituted. By the mortgage there was conveyed to the mortgagee: "6 Acres Oats; 4 Buckwheat; 2 Potatoes, growing or to be grown and produced during the year 1933 upon that certain piece or parcel of land in New Milford township, Susq. Co., Pa.," describing it, "Together with any and all crops thereon or to be grown elsewhere in the above mentioned County and State during the year 1933 by the Mortgagor". This land was the same from which the above sum of $1,539.28 for distribution was realized.

The chattel mortgage also recited that the loan was "evidenced by a promissory note dated April 22, 1933." Both were executed because "the said Mortgagor" was "indebted unto the Secretary of Agriculture, Washington, D. C., acting pursuant to" the Act of January 22, 1932, 47 Stat. at L. 5, creating the Reconstruction Finance Corporation.

By the said promissory note, of which there was an admittedly correct copy in evidence before the auditor, the maker, Burton T. Hall, agreed to pay the "said Secretary of Agriculture at Washington, D. C., acting as aforesaid (under Act of Congress approved January 22, 1932,) or his duly authorized representative", the sum of $300 and interest, "which has been loaned to me by the said Secretary of Agriculture acting as aforesaid, and for which said loan I have this day executed unto the said Secretary of Agriculture acting as aforesaid, a chattel mortgage upon livestock as security for said loan".

It is singular, but immaterial, to note that this recital on the note is of a chattel mortgage upon livestock, while the mortgage itself shows it to be of crops instead, livestock being nowhere mentioned.

The "condition" of the note was that if the said sum and interest be paid then "the same shall be void, otherwise to be and remain in full force and virtue". And the remedy provided in case of default was:

"I hereby consent that the chattel mortgage executed by me may be foreclosed and the chattels mortgaged thereunder may be sold upon this bond in the manner authorized by the Statutes of the Commonwealth in the case of personal property sold under execution".

The note contained the usual authority to confess judgment, waiving appraisement and exemption. Judgment never was entered thereon, but the chattel mortgage was duly entered, on May 10, 1933, in Susquehanna County Chattel Mortgage Book 64, at page 15.

The remedy of collection upon default, as recited in the chattel mortgage, was as follows:

"The said Mortgagee or his agents, may enter, take possession of the same or sell the same, or so much thereof as may be necessary, at public auction for cash, to satisfy said debt and interest and all expenses that may become necessary in the keeping, care, harvesting and sale of said crop, after giving notice as may be required by law of the time and place of sale, and shall apply the proceeds of such sale to the discharge of said debt, interest and expenses, and shall pay any surplus to the mortgagor or his assigns".

The sale of the real estate designated as the location of the crop mortgage took place on September 25, 1934, and was finally confirmed by the Orphans' Court of Susquehanna County on November 22, 1934.

None of the items of general inventory charged in the executors' account for distribution is for crops.

The date of the death of the decedent, Burton T. Hall, is May 28, 1934.

The auditor denied the claim of priority, rejected the same and scheduled distribution of the funds of the estate otherwise, under and in accordance with section 13 (a) of the Pennsylvania Fiduciaries Act of June 7, 1917, P. L. 447. To this disallowance of the priority claim the present exceptions are filed by the United States of America, for and on behalf of the Governor of the Farm

Credit Administration, successor in title to the Secretary of Agriculture of the United States of America. The exceptions are sworn to by "Joseph P. Brennan, Assistant U. S. Attorney", and recite that the exceptant is a "corporation sovereign".

The funds of the estate for distribution were insufficient to pay all debts of the estate; consequently it was a case of insolvency.

The reason given by the learned auditor for the disallowance of the claim is:

"No evidence was produced to your auditor to show that any part of the funds for distribution came from the crops mentioned in said crop mortgage, nor were they proceeds of any of said crops; therefore we refused to allow the said claim to be paid out of the funds for distribution".

### Discussion

The exceptant relies upon and cites section 3466 of the Revised Statutes:

"Whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor, in the hands of the executors or administrators, is insufficient to pay all the debts due from the deceased, the debts due to the United States shall be first satisfied; and the priority hereby established shall extend as well to cases in which a debtor, not having sufficient property to pay all his debts, makes a voluntary assignment thereof, or in which the estate and effects of an absconding, concealed, or absent debtor are attached by process of law, as to cases in which an act of bankruptcy is committed."

The exceptant relies also upon the Pennsylvania Act of March 2, 1933, P. L. 6, which authorizes those engaged in farming, etc., to borrow funds from the "Secretary of Agriculture . . . and . . . give as security for such loan a bond, containing a confession of judgment, secured by a chattel mortgage".

The act further provides:

"Such mortgages shall be a lien against the chattels and crops thereby conveyed, and shall be good and available in law against all subsequent purchasers or execution creditors, upon the recording thereof. . . . Such mortgage shall remain a lien on the property mortgaged as between the parties thereto until paid; but as to third parties shall not remain a lien for a longer period than five years", unless a notation of extension be entered on the margin of the original record in the office of the recorder of deeds.

By section 4 of the act, the remedy for collection upon default is that the mortgage be "foreclosed and the mortgaged chattels sold in the same manner as authorized by the laws of this Commonwealth in the case of personal property sold under execution."

This Act of 1933 is followed by the amending Act of April 18, 1935, P. L. 38, which further provides, in section 1, that, besides being a lien upon the chattels mortgaged:

"The lien of any mortgage on crops, executed in pursuance of the provisions of this act, shall be superior to any mortgages or judgments or any other liens or encumbrances upon the land upon which any such crop has been so seeded or may be growing, and any sale made under any mortgage or judgment or other lien or encumbrance upon such land before such crop has been severed shall be made subject to the lien on said crop as provided for in this act; provided, however, that the provisions of this act shall not in any manner whatever affect any mortgage, judgment or other lien or encumbrance upon the land recorded prior to the approval of this act."

It is interesting to note the opinion of Davison, P. J., of the Common Pleas of Franklin County, in Karns et al. v. East Central Fruit Growers' Production Credit Assn., 20 D. & C. 83, 86, that, previous to the Pennsylvania statute of 1933, supra, chattel mortgages, while good between the parties, could not affect third parties, such as

innocent purchasers from the owner, or his creditors; that the provisions of the act of Congress under which the chattel mortgage and accompanying promissory note or bond were executed by the decedent at bar could not apply to Pennsylvania borrowers; that the Pennsylvania statutes of 1933 and 1935 were enacted to "remedy that situation"; that they were in a sense emergency legislation and as such entitled to a most liberal construction: as an apparent and inferential recognition of such prior exclusion and of the necessity of the empowering provisions of the Pennsylvania statutes cited. But no reference is made to section 3466 of the Revised Statutes or its application and effect.

It appears that the date of the loan, chattel mortgage and promissory note of the decedent at bar was April 22, 1933, not until after the enactment of the Pennsylvania Act of March 2, 1933, P. L. 6. But in this connection we do not lose sight of the fact that the opposing creditor, Grange National Bank of Susquehanna County, first obtained its judgment lien on November 1, 1933, subsequent to the recording of the chattel mortgage under consideration on May 20, 1933, but before passage of the amending Act of 1935.

The Pennsylvania Act of 1933 made no provision for a preference of the lien of such chattel mortgages over those of bona fide lien holders against the land itself upon which the mortgaged crops were or were to be grown; again we note the question of the necessity for the enactment of the 1935 amending statute, containing such provisions. It was not passed until April 18, 1935, later of course than either the recording of the chattel mortgage or the entry of judgment by the Grange Bank as a lien creditor upon the real estate of the decedent debtor; therefore, it must be admitted, so far as the application of the Act of 1935 is to be considered, the Grange Bank, as a prior judgment creditor, is in terms exempted by the proviso of the act from the jeopardy of subsequent subordination to the chattel mortgage.

While the remedy for the collection of the debt secured by the chattel mortgage and accompanying note is recited in both and provided for in the Pennsylvania statutes as "foreclosure of the mortgage and sale as by execution", we cannot bring ourselves to hold that this remedy is exclusive, despite the general principle of the Act of March 21, 1806, 4 Sm. L. 332, 1 Purd. Dig. (13 ed.) 271 (d), that where a particular remedy or power is provided by statute it must be followed without resorting to common law: 8 Vale Dig. col. 24825. The Pennsylvania Act of 1935 provides for their lien upon the real estate of the debtor, out of the proceeds of which presumptively the mortgage creditor could be paid, for the Act of 1806 does not apply as to a statutory remedy which is ineffective: Rhines v. Clark et al., Execs., 51 Pa. 96.

The Pennsylvania Act of 1935 is an amendment to that of 1933, and its first section is "hereby amended *to read as follows*" (italics ours), and its new phraseology, printed in italics, incorporates what we have above quoted relative to the liens and the priority of such chattel mortgages upon the real estate of the mortgagor debtor, not expressed nor implied in the section of the 1933 act as amended. For authority that such new matter speaks and can be given effect and operation only as of its date, April 18, 1935, we have the opinion, in which we concur, of Metzger, P. J., of the Twenty-ninth Judicial District of Pennsylvania, in Fowler v. Columbia County, 18 Pa. C. C. 653; it cannot be interpreted as subordinating the judgment lien secured meanwhile by the Grange National Bank, in its status of existing priority and preference under the statutes and decisions of the Pennsylvania courts, nor can it give the chattel mortgage of the United States the status of such a lien, whether by priority or otherwise, and particularly so where, as here, the amendment expressly reserves the rights of existing lien creditors.

Thus far we have discussed the relative status of the contending claimants under the law of Pennsylvania relating to the distribution of assets to creditors of de-

cedents' estates, and without regard to United States Revised Statutes section 3466, quoted earlier in this opinion, which is urgently contended for as superseding the Pennsylvania schedule of distribution of an estate such as that of the present decedent, whose assets were insufficient to pay all his debts: to interpret, an insolvent estate. We now give our attention to this feature. . . .

### Opinion sur reargument

SMITH, P. J., August 27, 1936.—Our reasons for ordering a reargument of the exceptions to the auditor's report in the above case are so fully stated in our order therefor and opinion refusing its dismissal or revocation, heretofore filed, and to which reference is here made, that we will not further elaborate them here.

### Discussion

Exceptant relies upon and cites section 3466 of the Revised Statutes of the United States, viz.:

"Whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor, in the hands of the executors or administrators, is insufficient to pay all the debts due from the deceased, the debts due to the United States shall be first satisfied; and the priority hereby established shall extend as well to cases in which a debtor, not having sufficient property to pay all his debts, makes a voluntary assignment thereof, or in which the estate and effects of an absconding, concealed, or absent debtor are attached by process of law, as to cases in which an act of bankruptcy is committed."

Administration of executive Governmental affairs of the United States rests with the President primarily, and also with the members of his cabinet within their respective spheres of jurisdiction and the heads of their departments: ". . . the act of a head of a department is in legal contemplation the act of the President. . . . He speaks and acts through the heads of the several departments in relation to subjects which appertain to their re-

spective duties". This applies to subordinate agents of the several departments, and by implication, without express authority of the President in a particular case: Roxford Knitting Co. v. Moore & Tierney, Inc., 265 Fed. 177, 190, citing Scott v. Carew, 196 U. S. 100, 109, 110; United States v. Farden, 99 U. S. 10, 12; Runkle v. United States, 122 U. S. 543, 557; Wolsey v. Chapman, 101 U. S. 755, 769; 6 Opinions Attorney General 583, 587.

The original loan, secured by the promissory note to the Secretary of Agriculture, was recited in decedent's crop-loan mortgage to have been made pursuant to Act of Congress approved January 22, 1932, 47 Stat. at L. 5, creating the Reconstruction Finance Corporation. We will assume that the loan was made from the $50,000,000 appropriated to him directed to be expended by him "for the purpose of making loans or advances to farmers . . . for crop production". By the supplemented Act of February 4, 1933, 47 Stat. at L. 795, sec. 1, the balance unpaid of the $50,000,000 appropriated from the Reconstruction Finance Corporation was directed to be paid the Secretary of Agriculture for loans by him to farmers, etc.

The Act of January 22, 1932, supra, provides the loan shall be "A first lien on all crops growing, or to be planted and grown", and the Act of 1933, supra, sec. 2(a), as amended by the Act of May 1, 1933, 48 Stat. at L. 30, includes as so subject to lien "all crops growing or to be planted, grown, and harvested during the year 1933 . . . [as shall] in the discretion of the Secretary of Agriculture, be deemed sufficient security".

The application of this first-lien provision will be discussed later in this opinion.

With the status of the Secretary of Agriculture as decided in Rexford Knitting Co. v. Moore & Tierney, Inc., supra, the crop loan at bar, made to Burton T. Hall by the United States through the agency of the Secretary of Agriculture, would thus be a debt "due the United States".

But later than the legislation we have recited, viz., on March 27, 1933 (12 U. S. C. 793, 794), the President of the United States issued an executive order: "Reorganizing Agricultural Credit Agencies of the United States," by which all functions of the Secretary of Agriculture were transferred to the Farm Credit Administration:

"The functions of the Secretary of Agriculture under all provisions of law relating to the making of advances or loans to farmers . . . and owners of . . . crops", etc., with one exception not mentioned here.

The order closes with the statement that it "shall take effect upon the sixty-first calendar day after its transmission to Congress unless otherwise determined in accordance with the provisions of section 407 of the act cited above". While we have not been advised of the exact date of its taking effect, it is obvious that it was prior to the present proceedings in the orphans' court, and was so treated in the exceptions filed to the auditor's report. On behalf of the United States it was stated that its priority claim was "In favor of the United States of America for and on behalf of the Governor of the Farm Credit Administration, successor in title and interest to the Secretary of Agriculture by executive order issued on March 27, 1933." And it is so averred in the proof of claim filed with the auditor making distribution. This is a recognition of the title to the claim which the Governor of the Farm Credit Administration acquired from the Secretary of Agriculture by executive order, with the same legal force as if a formal written assignment by the secretary had been made.

The foregoing statutes and executive order are material to the determination whether the claim is entitled to priority as a debt due and payable to the United States within the provisions of section 3466 of the Revised Statutes of the United States, or is payable to the Farm Credit Administration as an entity in itself, as affecting the present claim, and therefore not entitled to priority;

for a debt to be entitled to priority by section 3466 of the Revised Statutes of the United States, relied upon at bar, must be one due the United States. The law was so expressed by Judge Walker in Florida Bank & Trust Company of West Palm Beach v. Union Indemnity Co. et al., 55 F. (2d) 640, 641.

While we have already conceded that the original loan by the Secretary of Agriculture out of the $50,000,000 appropriated to him created a debt to the United States, still, by the executive order, it was a debt of which the Farm Credit Administration became the creditor, nominally at least, and we are now to inquire and answer the question whether it stands in such relation to the United States as to come within the provisions of section 3466 of the Revised Statutes.

The right to priority does not rest on sovereign prerogative, but is founded entirely on this section: Hatch v. Morosco Holding Co., Inc., 56 F. (2d) 640; Price, Receiver, v. United States, 269 U. S. 492; which was "enacted to advance the same public policy which governs in the cases of royal prerogative; that is, to secure adequate public revenue to sustain the public burdens": County of Spokane, Washington, et al. v. United States, 279 U. S. 80, citing United States v. The State Bank of North Carolina, 31 U. S. 29: "And to that end, §3466 is to be construed liberally. Its purpose is not to be defeated by unnecessarily restricting the application of the word 'debts' within a narrow or technical meaning." "The meaning properly to be attributed to that word depends upon the connection in which it is used in the particular statute and the purpose to be accomplished": Mr. Justice Butler, in Price, Receiver, v. United States, supra. And it is to be construed "liberally . . . in favor of the government, so as to effect the general purpose, as at common law, of according the sovereign preference, by virtue of the crown prerogative, in the collection of revenue": Hatch v. Morosco Holding Co., Inc., supra; or, as said in United States v. The State Bank of North Carolina, supra: "The

same policy, which governed in the case of the royal prerogative, may be clearly traced in these statutes". Mr. Justice Brandeis, in United States v. National Surety Co., 254 U. S. 73, affirmed this common-law analogy. In passing upon the question of priorities under the provisions of the bankruptcy law, the court in In re Brannon et al., 62 F. (2d) 959, 960, restricted them to such preferences as may in insolvency be given by law to debts due the sovereign, referring to examples under Revised Statutes, sec. 3466.

The Reconstruction Finance Corporation was created by The Reconstruction Corporation Act of January 22, 1932, supra, with a capitalization of $500,000,000, all to be subscribed by the United States of America, the shares to be issued to the Secretary of the Treasury as evidence of their ownership by the United States. Such a corporate entity was the Emergency Fleet Corporation, held in United States, ex rel., v. McCarl, etc., 275 U. S. 1, to be "distinct from the United States and from any of its departments or boards", and not to "enjoy the priority of the United States", although the stock be all owned by the United States. It was held to stand on the footing of an ordinary creditor: Sloan Shipyards Corp. et al. v. United States Shipping Board, etc., 258 U. S. 549.

The creating act of the Reconstruction Finance Corporation provides it may sue and be sued, complain and defend, in any court of competent jurisdiction, State or Federal.

The distinction between such corporations and other governmental instrumentalities is clearly stated in North Dakota-Montana Wheat Growers Assn. v. United States, 66 F. (2d) 573, 576; United States, ex rel., v. McCarl, etc., supra; and United States v. Strang, 254 U. S. 491, which also holds that this separate entity may exist notwithstanding the United States owns all the stock. See also Sloan Shipyards Corp. et al. v. United States Shipping Board, etc., supra.

In Pennsylvania, Mr. Justice Kephart, in Haines et al. v. Lone Star Shipbuilding Co. et al., 268 Pa. 92, supports the same proposition in a very clear opinion, citing and affirming the principle of the early case of Turnpike Co. v. Wallace, 8 Watts 316, 318, and the United States decision in The Bank of the United States v. The Planters Bank of Georgia, 9 Wheat. 904, 909 (22 U. S.), that:

"When the government wishes to embark in industrial enterprises . . . it places its money and its sovereign position in the same plane as any other stockholder buying stock in the same corporation."

This Pennsylvania case is cited and approved by the district court of the United States in United States v. Skinner & Eddy Corp., 28 F. (2d) 373. And in Providence Engineering Corp. v. Downey Shipbuilding Corp., 294 Fed. 641, 656, the circuit court of appeals says:

"We see no escape from the conclusion which the Supreme Court of Pennsylvania reached in the case above referred to. The reasons given for it seem to us unanswerable."

For its further affirmance see Shepard's Citations. The same is the law in New Jersey: The Board of Chosen Freeholders of Middlesex County v. The State Bank of New Brunswick, 30 N. J. Eq. 311.

We therefore conclude that the Reconstruction Finance Corporation, if it were the claimant at bar, could not be allowed the priority because of its corporate status as an entity separate from the United States. Our above review is deemed helpful and really necessary as affecting the status of the Farm Credit Administration as successor in title to the subject matter of the present contention.

The Farm Credit Administration is, with but a change of name by the President's order of March 27, 1933, 12 U. S. C. 793, the previously existing Federal Farm Board, to be managed by one designated as Governor of the Farm Credit Administration, by whom, in behalf of the United States, the present claim to priority is made.

We must determine whether the claimant is so related in composition and functions to the United States of America that the latter is the real party to whom the present debt is payable, and thus is entitled to assert its priority, or whether the Governor of the Farm Credit Administration, as successor to the Federal Farm Board, is the exclusive legal entity for that purpose. We are fortunate that the only Federal court decision on that point our research discloses, North Dakota-Montana Wheat Growers Assn. v. United States, 66 F. (2d) 573, decides that the Federal Farm Board is an unincorporated agency of the Government to carry out the purposes of the statute, and has no separate entity distinct from the Government, and that the United States is the proper party to sue to foreclose a real estate mortgage given to secure payment of a loan made by the Federal Farm Board. As the Farm Credit Administration has the same characteristics as the Federal Farm Board, the same conclusion would apply to the present debt secured by the promissory note and the chattel mortgage on crops.

Thus far we have discoursed upon the question of the proper party claimant. But further important considerations must be noticed: Having already affirmed the right of the United States to be the proper party to claim priority, query, is the debt of the character included in Revised Statutes, sec. 3466, which is silent of enumeration either of class groups or industrialism? We may consider this as one of the features of ambiguity of Revised Statutes, sec. 3466, of which Coffey, district judge, in Hatch v. Morosco Holding Co., 56 F. (2d) 640, 641, says "it must be confessed that, at best, the language . . . is ambiguous". He adopts as one of the rules for its construction that it "must be liberally construed in favor of the government, so as to affect the general purpose, as at common law, of according the sovereign preference, by virtue of the crown prerogative, in the collection of revenue", citing United States Supreme Court authorities.

Before entering upon a discussion of the status of the "debt" at bar we quote judicial language which, though not from actual decisions, embodies principles of construction relating to new problems of weight for our consideration.

Circuit Judge Mack, of the southern district of New York, in The Pesaro, 277 Fed. 473, 475, said:

"In attempting to solve a confessedly new and unsettled problem, the court, while conforming its decision to certain forms or standards evolved from within the legal system, should not determine the application of these . standards solely by logic. It may have to choose between competing judicial analogies and parallel trends of juristic though; its conclusions should, if possible, conform to the practical ends of the law in a moving, working world.

"So in dealing with an unsettled problem . . . of sovereign immunity, the court must not only consider history and logic; it must also look behind and beyond both and inquire whether the public interests justify or require an extension of sovereign exemption from the usual processes of judicial justice. With the growth and development of state activity, it behooves the court to consider the consequences which would flow from a ruling removing from the ordinary judicial administration matters of vital importance to the community, which have for centuries been handled through the regular judicial processes."

And the same jurist, in Davis, etc., v. Michigan Trust Co., 2 F. (2d) 194, 197, said:

"Judicial opinion as well as legislation is examining anew the proper privileges and immunities to be accorded the sovereign state, and in cases not clearly covered by statute or decision the correct solution is not to be found by the application of an abstract formula, but by the most careful consideration of the public needs and the practical requirements of law in the modern industrial community."

Also Learned Hand, J., in Gould Coupler Co. v. United States Shipping Board Emergency Fleet Corp., 261 Fed. 716, 718, denying immunity of the United States from suit, said:

"The immunity of the sovereign may well become a serious injustice to the citizen, if it can be claimed in the multitude of cases arising from governmental activities which are increasing so fast. At least I have no disposition to strain the point in their favor, where they fall clearly within the principle of authoritative decisions."

We subscribe to this notwithstanding the language of Kenyon, J., in North Dakota-Montana Wheat Growers Assn. v. United States, supra, page 578:

"When the sovereign itself is sued, the immunity is absolute, regardless of the functions out of which the suit arose, and the suit can only be maintained by the sovereign's consent."

As section 3466 of the Revised Statutes, already quoted, must be construed as in pari materia with section 3467, we quote the latter:

"Every executor, administrator, or assignee, or other person, who pays any debt due by the person or estate from whom or for which he acts, before he satisfies and pays the debts due to the United States from such person or estate, shall become answerable in his own person and estate for the debts so due to the United States, or for so much thereof as may remain due and unpaid."

That the debt claimed at bar is due to the United States in the sense that the money loaned was originally part of that in the United States Treasury, and ultimately to be repaid thereto, is incontrovertible, and we admit that concededly it was created by the loan of funds out of the Treasury accumulated from funds which in the aggregate had been collected as revenue to the United States, viz., "The income of the government arising from taxation, duties, and the like": Bouvier's Law Dictionary; "the product or fruit of taxation": United States v. Wright et al., 3 Pittsb. 192. Items of revenue unpaid are debts

due to the United States. But the term, as used in Revised Statutes, sec. 3466, is restricted as explained in the opinion of the court in Hatch v. Morosco Holding Co., Inc., supra, and the citations ante, to obligations "according the sovereign preference, by virtue of the crown prerogative", by the application of the same policy which governed in the case of the royal prerogative traceable in prior statutes: United States v. The State Bank of North Carolina, supra; United States v. National Surety Co., supra.

Apropos to this question of required security, we note that prior to the Pennsylvania statute of March 2, 1933, P. L. 6, preference to such chattel mortgage loans as at bar was not recognized in Pennsylvania. Knowing this, Congress, by the Act of June 16, 1933, 48 Stat. at L. 257, sec. 80, directed an investigation of means of affording such preference in the various States, which undoubtedly influenced the language of this Pennsylvania statute. Congress had provided in the meantime for emergency loans by the Secretary of Agriculture out of the $50,000,-000 allocated to him by the Reconstruction Finance Corporation. The Pennsylvania statute enacted in substance the provisions of the Congressional act, requiring, and defining the character of, such security by promissory note and chattel mortgage. This emphasizes and confirms our present decision as to the immunity of the debt at bar from the priority contended for.

In this connection we cannot refrain from calling to attention, as of some significance, the fact that on the crop mortgage executed by the decedent mortgagor, Burton T. Hall, is a form, printed on its upper left hand corner, which is identical for loans in Delaware, Maryland, Massachusetts, Ohio, New Hampshire, New York and Rhode Island; Pennsylvania is not included. From this we believe some implication may be drawn that in the States named the preference was authorized. Further, it will be noted that the Burton T. Hall mortgage was executed April 23, 1933, 21 days after the Pennsylvania

statute of March 2, 1933, supra, and obviously because of its enactment, as it does not provide for any lien on real estate, the proceeds of which are the only fund for present distribution.

Potent in the aid of our solution of the problem of the intention of the early Congress enacting Revised Statutes, secs. 3466, 3467, is our disbelief that they had that sufficient foresight or imagination of the progress and development of the United States to its future status with respect to territory, governmental functions, and the multiplied and diversive habits, entireties, pursuits and necessities of its present millions of people, to have intended that the priority of the United States should apply to such claims as at bar, punctuated especially by jeopardy of personal liability of representatives of debtors provided in section 3467, Revised Statutes.

"It is a well-established rule of statutory construction that, to determine the legislative intent, the court may take into consideration the conditions existing at the time of the legislation in question, upon which legislation was intended to operate": Hincks, J., in General Broadcasting System, Inc., v. Bridgeport Broadcasting Station, Inc., 53 F. (2d) 664, 667.

Mr. Justice Brandeis' exclusion of such debts from statutory priority in United States v. Guaranty Trust Co. of N. Y. et al., 280 U. S. 478, subjects the general inclusion of all debts by the court in Lewis, Trustee, v. United States, 92 U. S. 618, to the application of the known principle that "general expressions used in a court's opinion are to be taken in connection with the case under consideration": Bramwell, etc., v. United States Fidelity & Guaranty Co., 269 U. S. 483; and authorizes our present method of interpretation. Illustrative also is the Pennsylvania case of Monongahela Bridge Co. v. Pittsburgh & Birmingham Rwy. Co., 114 Pa. 478, deciding that the general words in a statute, "or other wheeled vehicles of whatever description", did not include street cars.

There has come into use a new term, viz., "revolving fund". The only legal definition, and the one which we adopt for our use, is by United States Circuit Judge Mayer, in United States v. Butterworth-Judson Corp., 297 Fed. 971, 979:

". . . a brief expression of recent coinage which usually refers to a renewable credit over a defined period. In simple parlance, it relates usually to a situation where a banker or merchant extends credit for a certain amount which can be paid off from time to time, and then credit is again given not to exceed the same amount. It may also mean a fund which when reduced is replenished by new funds from specified sources."

The fund was so designated by Mr. Justice Brandeis in his opinion in the case of United States v. Guaranty Trust Co. of N. Y. et al., supra, and this designation is inconsistent with a priority debt due the United States. Returning to the appropriations of funds to care for such crop loans as we are considering here, we are of the opinion the $500,000,000 of the original Reconstruction Finance Corporation and the apportionment of $50,-000,000 therefrom to the Secretary of Agriculture by the Act of January 22, 1932, supra, although not actually called "revolving funds" in the statute, were essentially so by reason of the methods of making loans therefrom and of repaying such loans. The present Burton T. Hall loan was out of said appropriation. It was evidenced by one of the notes or other obligations evidencing advances and loans enumerated, in the Act of June 16, 1933, supra, as included in the statutory "revolving fund" thereby created and so designated, into which repayment, if made, must have been made to the "Governor of the Farm Credit Administration", its custodian and administrator, and not to the United States of America in its governmental capacity. For that reason, the priority statute (Revised Statutes §§3466, 3467) could not apply. As a revolving object possesses both centrifugal and centripetal properties, we might properly

illustrate a revolving fund as being one out of which, as by centrifugal movement, the amount for a loan is thrown off and extracted, and, when replaced, is, as by centripetal movement, returned to and as part of the original fund.

Only by such a method of disbursements and receipts could such a fund be maintained to function properly for the purposes of its creation.

We cannot fail to note an implied assent that the primary right to claim for receipt of the funds at bar is in the Governor of the Farm Credit Administration instead of the United States of America, in the phraseology of the language presented, viz., that it is claimed by the latter, not in their own right, but "in behalf of" the former. This is significant in itself and is a barrier to the priority claim.

Also, the similarity of the embarrassment as to financial affairs of those engaged in agriculture to that of railroads, stated by Mr. Justice Brandeis in United States v. Guaranty Trust Co. of N. Y. et al., supra, which would result in affirming the priority of debts created for crop loans, is persuasive of our present denial of such priority.

And finally, consistent with the opinion just cited mentioning the requirement of adequate security for the payment of debts by railroads as precluding priority rights of the Government lender, we note that the same character of security is required for crop loans to farmers, viz., by promissory note and chattel mortgage, and that it is complied with in the one to Burton T. Hall which we are considering, evidenced by the proof of claim. We decide that it debars the United States from its priority under the Revised Statute, secs. 3466, 3467, as affording a substituted and exclusive remedy for the recovery of debts to which no priority is attached.

But if it be contended that our interpretation is contrary to the strict construction in favor of the Government which has been adjudged to be necessary, we believe such strictness attaches only to such debts as are possessed of the attributes which would entitle it to

priority, whereas the interpretation of others not so possessed should be favorable to the debtor so far as possible, consistency thus being preserved.

We believe the formula of interpretation, where the conclusions support it and in an issue where it should be supplied, is:

". . . where a particular construction of a statute will occasion great inconvenience or produce inequality and injustice, that view is to be avoided if another and more reasonable interpretation is present in the statute": per Hutcheson, circuit judge, in Constantine v. United States, 75 F. (2d) 928, 931; Knowlton v. Moore, 178 U. S. 41, 47.

The decision of Mr. Justice Brandeis in United States v. Guaranty Trust Co. of N. Y. et al., supra, brought to our attention only after the filing and entering of our former decree of April. 13, 1936, in favor of the United States, recognized and decreed the character of the debt there involved as not entitled to priority by the United States within the provisions of Revised Statutes, secs. 3466, 3467, and, as it was not in accord with the language of the court in Davis, etc., v. Pullen et al., 277 Fed. 650, 656, which expressed no exceptions, thus implying its interpretation by the rule of the strict meaning of the letter and words of the statute, we felt bound thereby as an adjudication of the Federal courts and deemed it our duty to reopen the issue and review the case, affording the attorneys engaged an opportunity of reargument, that we might conform to the very proper requirement that "A modern court should strive to do complete justice": per Mack, J., in The Gloria et al., v. Federal Sugar Refining Co., 286 Fed. 188, 193.

After able arguments by the attorneys, with briefs presented, and our own exhaustive research of authorities, we are now convinced of the error in our former ruling involving a subject matter of grave importance, both local and Nation-wide. Therefore we enter the following

190

*Order and decree*

And now to wit, August 27, 1936, after reargument, it is ordered and decreed that our former order and decree dated and filed on April 13, 1936, is hereby revoked, rescinded and made null and of no effect; further, that the claim of priority by the United States of America for and on behalf of the Farm Credit Administration, of the sum of $110.08, with interest from November 1, 1933, at the rate of 5½ percent, against the estate of Burton T. Hall, deceased, is disallowed; further, that the exceptions filed by such claimant to the auditor's report distributing the funds of said estate are dismissed; further, that our order of modification of the schedule of distribution and final confirmation of the auditor's report thus modified is also rescinded; further, that the schedule and report of said auditor as originally made and filed is hereby confirmed finally, and distribution directed in accordance therewith. Costs to be paid by exceptant, the United States.